## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **CARL V. MARSHALL,** | ) | |
| AIS#110574 | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **206-CV-1131-MHT** |
| | ) | |
| **RICHARD ALLEN, et al. .,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED ANSWER
## And
## SPECIAL REPORT

Defendants file this, their Amended Answer and Special Report, as directed by the Court, and substitute it, in its' entirety, for the original Answer and Special Report.

## PETITIONER'S ALLEGATIONS

The Petitioner, an inmate in the Alabama Department of Corrections, currently incarcerated at Red Eagle Farm in Montgomery County, Alabama, initially filed a complaint sounding in Section 1983, alleging certain constitutional violations against Alabama Department of Corrections defendants. Defendants were ordered to investigate and file a special report addressing claims of (1) confiscation of "Christmas package", (2) denial of adequate access to the courts, and, (3) subjection to unconstitutional conditions of confinement. Defendants filed their initial Answer and Special Report, addressing those issues.

Petitioner filed a response to defendants' Answer and Special Report, which the court treated as an attempt to amend his complaint.

1

This court then ordered defendants to investigate and file an amended Special Report and Answer, addressing specifically, (1) denial of adequate access to the courts, (2) denial of medical treatment, and , (3) subjection to cruel and unusual punishment.

## AMENDED EVIDENTIARY SUBMISSIONS
## IN SUPPORT OF RESPONDENT'S AMENDED SPECIAL REPORT

1. Affidavit (2nd) of Lt. Richard Naile (Exhibit 1).

2. Affidavit (2nd) of Capt. Joseph Womble (Exhibit 2).

3. Affidavit (2nd) of Lt. Edwin Lane (Exhibit 3).

4. Affidavit of Officer Jerry Odom (Exhibit 4).

5. Affidavit of Warden Charles Hadley (Exhibit 5).

6. Disciplinary Report for November 29, 2006, Possession of Contraband (Exhibit 6).

7. SOP 09-05, "Emergency Fire Procedure" and fire evacuation plan (Exhibit 7).

8. AR-412, "Institutional Law Libraries" (Exhibit 8).

9. AR-448, "Inmate Mail" (Exhibit 9).

10. October 19, 2006 email from Deputy Commissioner Lovelace re: Christmas package rules (Exhibit 10).

11. December 13, 2006 email from Joseph Womble re: inmates who do not meet package criteria (Exhibit 11).

12. Health Department Food Inspection Report dated April 10, 2006, 96 Score (Exhibit 12).

13. Health Department Detention Facility Inspection Report dated April 10, 2006, reflecting the Red Eagle facility population to be under its rated capacity. (Exhibit 13).

14. State Fire Marshalls' Inspection Report, with notations of corrective actions taken.

(Exhibit 14).

15. UPS shipping Receipt dated December 18, 2006. (Exhibit 15).

16. PMOD Account Transactions Report for Petitioner, dated Jan. 1, 2007 – Jul. 3, 2007,

reflecting payment from Christmas package vendor to petitioner. (Exhibit 16).

## INVESTIGATIVE RESULTS

Petitioner (hereinafter referred as "Marshall"), makes wildly rambling, broad brush

allegations as set out above. Investigative results as to each allegation are discussed below.

### *Confiscated Christmas Package*.

The Department of Corrections has a long standing practice of making special Christmas

packages available to inmates, who are in "good standing", and have not had any disciplinary

actions, formal or informal, during the months of November and December. (Exhibits 1,2,3,9).

That policy is well known among the inmates, and is distributed to them well in advance

via the inmate bulletin board and notification system. (Exhibits 2 & 3). .

Marshall was convicted of a violation of Rule #64, "Possession of Contraband" on

December 5, 2006, for an incident that occurred on November 29, 2006. (Exhibits 1,2,3&6).

Therefore, when Marshall's package arrived, he was not permitted to receive it.

On December 18, 2006, Petitioners' package, along with others, was picked up by UPS

Ground, for return to the outside vendor. (Exhibits 2 & 15).

On April 20, 2007, petitioner received $55.10 from the gift package vendor, which amount

was deposited to petitioners' PMOD account. (Exhibit 16).

Petitioners' package was intercepted and returned to the vendor because petitioner was not

eligible to receive a Christmas package pursuant to AR 448. (Exhibits 1,2,3,9,10, & 11).Marshall

had received a disciplinary for possession of contraband in the month of November, 2006.

3

(Exhibits 1,2,3 & 6).

Respondents have no control over the package vendor, who is responsible for refunding Marshall his money. Respondents have certainly placed no obstacles in Marshall's way to hinder him receiving any refund he may be entitled to from them.

Marshall has received a refund from the vendor.

### ***Denied Access To Courts***

Marshall makes a totally baseless allegation of denial of access to the courts and\or the law library.

The law library has never been shut down and unavailable to inmates. It is fully supplied, and available, subject to certain hour and use limitations. The printer has never been removed. On one occasion, because of abuse and misuse by some inmates, the printer cartridge was briefly removed, pending a decision as to what to do in order to protect the equipment from abuse by a small minority of inmates. (Exhibit 1).

Lt. Lane testifies that the law library is open from 6:00 PM to 9:00 PM and at other times, on request by an inmate, provided security is available. Inmate Marshall has never asked Lane for use of the law library during his shift. As an African American himself, Lane has obviously never discriminated against Marshall, who is an African American. (Exhibit 3).

Captain Womble testifies that the printer was changed from "free access" to "restricted access", due to abuse by some inmates. Law library supplies were ordered on January 29, 2007, and made available to the inmates on February 1, 2007. Marshall has never asked Capt.Womble for any legal supplies. (Exhibit 2).

Marshall has never asked Lt. Naile for any legal supplies. Lt. Naile did learn at one point that there were some abuses of use of the computer printer by some inmates, and he was instructed

4

to remove the printer cartridge until further instructions from the department legal division. (Exhibit 1).

As for "retaliation", none of the respondents was even aware of Marshall's "litigious bent", so therefore, they could not possibly be guilty of retaliating against Marshall for his "legal activities" and\or "race". (Exhibits 1,2,4,5 & 8).


### *Denied Medical Treatment*

Inmate Marshall attempts to assert a claim of "deliberate indifference" due to being "denied medial treatment".

Defendants are, quite frankly, at a complete loss to find such a claim anywhere in any of petitioners' pleadings. With no averments as to what defendants did wrong, it is impossible to frame a response to such a bare assertion.

It should first be noted that ADOC does not provide any medical services to inmates. All such services are provided under contract by a medical service provider named Prison Health Services (PHS). All that an inmate has to do to receive medical treatment is to "sign up" to see a doctor, or dentist, or whatever type medical professional they are in need of. ADOC has nothing to do with scheduling appointments with medical personnel or the rendering of any medical services.

In Marshalls' original complaint, the only reference to medical issues is on his complaint page 11, paragraph 1., which is actually an alleged "damages" listing, combined with a "prayer for relief". He writes at paragraph 1, "Marshall's health under hypertension – blood pressure, mental anguish, stress, and actual medical condition has been damage. Marshall was taken to Kilby where medical doctor has had to increase medication for blood pressure and stress. Marshall seeks the full sum of ten thousand dollars each named defendant."

The only other reference to medical issues is found in Marshalls' "amended complaint" at his paragraph 4 on page 2. "Plaintiff also brought before this Court a substantial claim of medical indifference in the way that he was exposed to Cruel and Unusual punishment through actions which were direct and intentional by Defendants. Plaintiffs' medical condition deteriorated in such a manner as to require him to be transported to a different facility where his medical condition could be assessed and treated. The mere fact that he was transported does not exclude the claim, rather, it supports the fact that he suffered in one way or another, abuse as to cause physical conditions to deteriorate."

Defendants submit to this honorable court that the above fails completely in setting out a claim of "deliberate indifference" and\or a "denial of medical treatment". Marshall fails completely to set out any act or omission against any defendant as to how he (Marshall) was denied medical treatment. It is impossible for defendants to frame an answer to such.

Lt. Naile, as the second shift commander, specifically denies ever denying Marshall any type of medical treatment. (Exhibit 1). No other defendant was ever in a position to have any knowledge of Marshall needing or requesting medical services, and thus, all deny any such claim by Marshall.

### *Unconstitutional Conditions of Confinement*

With no offering of anything to substantiate them, Marshall wildly claims that Respondents have violated his rights by subjecting him to unconstitutional conditions of confinement. Again, it is almost impossible for defendants to decipher what act or omission they are being accused of by Marshall. He apparently is attempting to assert that conditions are a fire hazard and that conditions are unsanitary, but defendants are only guessing that those are the

"unconstitutional conditions" he complains of. Whatever the conditions are that he complains of,

he does not ever allege which defendant(s) are guilty of acts of commission or omission to create

the alleged conditions.

Respondents simply say that nothing could be further from the truth. Respondents submit

for the Court's review, Exhibits 7, 12, 13 & 14. Exhibit 7 is a copy of SOP 09-05, "Emergency

Fire Procedures", which reflects a detailed and adequate fire escape plan for the entire facility.

Exhibit 12 is a copy of the Health Department Food Inspection Report dated April 10,

2007, reflecting a health rating of 96 !!!! Exhibit 13 is a copy of the Health Department Detention

Facility Inspection Report dated April 10, 2006, which reflects the fact that the Red Eagle facility

is rated to house a capacity of 308 inmates, but the actual population on the date of inspection was

only 267. Exhibit 14 is a copy of a State Fire Marshall Inspection conducted on February 23,

2007, listing minor deficiencies, and noting the corrective actions taken and\or started.

## ANSWER

The Defendants assert the following defenses to the Plaintiff's claims:

1. The Defendants deny each and every material allegation contained in the Plaintiff's Complaint and demand strict proof thereof.

2. The Plaintiff's Complaint fails to state a claim upon which relief can be granted.

3. The Defendants cannot be held liable on the basis of *respondeat superior*, agency, or vicarious liability theories.

4. The Plaintiff is not entitled to any relief under 42 U.S.C. § 1983.

5. The allegations contained in the Plaintiff's Complaint against the Defendants, fail to comply with the heightened specificity requirement of Rule 8 in § 1983 cases against persons sued in their individual capacities. *See Oladeinde v. City of Birmingham,* 963 F.

7

2d 1481, 1485 (11th Cir. 1992); *Arnold v. Board of Education Of Escambia County*, 880 F.

2d 305, 309 (11th Cir. 1989).

6. The Defendants plead all applicable immunities, including but not limited to sovereign, qualified, absolute, discretionary function, state agent, and statutory law enforcement officer immunity.

7. All claims of the Plaintiff against these Defendants in their official capacity are barred by the Eleventh Amendment to the United States Constitution.

8. The Defendants plead the affirmative defense of contributory negligence and assumption of the risk.

9. The Plaintiff has failed to exhaust his administrative remedies as mandated by the Prison Litigation Reform Act amendment to 42 U.S.C. § 1997e (a) and as such these claims should be dismissed.

10. The Defendants plead the affirmative defense that they are not guilty of any conduct which would justify the imposition of punitive damages against any of them and that any such award would violate the United States Constitution.

11. The Plaintiff has failed to comply with 28 U.S.C. § 1915 with respect to the requirements and limitations inmates must follow in filing in forma pauperis actions in federal court.

Pursuant to 28 U.S.C. § 1915 A, this court is requested to screen and dismiss this case, as soon as possible, either before or after docketing, as this case is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks money damages from the Defendants who are state officers entitled to immunity as provided for in 42 U.S.C. § 1997 (e) (c).

## ARGUMENT

Marshall does not, with any specificity whatsoever, allege any actions or inaction on the

8

part of these Defendants which would subject them to liability under 42 U.S.C. Section 1983.

Based on the above evidentiary submissions of Respondents, there simply is no factual basis to any of Marshall's absurd claims. Marshall offers nothing but wildly speculative and unsubstantiated assertions. The burden is on the petitioner to come forward with more than mere speculation and accusatory innuendo. Marshall has completely failed to meet his burden, and Respondents are entitled to a dismissal of all of Marshall's claims, and for costs and other appropriate sanctions to be assessed against Marshall for his completely frivolous and factually and legally baseless petition.

### ***OFFICIAL CAPACITY***

Defendants argue that each ADOC defendant is sued in his official capacity, **only**. Marshall has failed to allege, and offers no evidence, that any defendant has acted in his individual capacity to harm petitioner.

Plaintiffs' complaint, as amended, makes broad brush allegations against Alabama Department of Corrections employees "Commissioner Richard Allen, Warden Charles Hadley, Captain Joseph Womble, Lt. Edwin Charles Lane, Lt. Richard Naile, Officer Jerry Odom, and attorney Kim Thomas." At all times, petitioner makes reference to each defendant by identifying them by their official "title" or "position". All claims asserted by inmate Marshall arise out of their official duties, and in their official capacities as employees of the Department of Corrections. Petitioner makes no reference whatsoever to any defendant being sued in his individual capacity.

Therefore, defendants argue that they are entitled to 11th Amendment \ Sovereign Immunity, and offer the following as authority.

### *11th Amendment Immunity / Sovereign Immunity*

Plaintiff's federal claims (as well as all state pendente claims) under 42 U.S.C., Section

1983 against these defendants in their official capacity, are barred by the 11th Amendment to the United States Constitution. Therefore, the plaintiff's claims against these defendants under Section 1983 are due to be dismissed as a matter of law for lack of subject matter jurisdiction. The 11th Amendment to the U.S. Constitution bars the federal court from exercising jurisdiction over states. Ex Parte Young, 209 U.S. 123.

Claims against the State of Alabama and its agencies, officers and agents, under Section 1983, are barred by the 11th Amendment to the United States Constitution. Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989); see also Dean v. Barber, 951 F.2d 1210, 1215 (11th Cir. 1992).

The 11th Amendment to the Constitution of the United States of America bars any claims, including any and all pendente state law claims, against a state or its officials in the absence of the consent of the state. See Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99-100 (1984) (wherein the Supreme Court of the United States held that the 11th Amendment barred any and all state law claims brought in U.S. District Court under pendente jurisdiction, as well as under Section 1983.) Marshall has failed to allege, and he offers no evidence whatsoever that there has been a waiver of the State of Alabama's 11th Amendment immunity in this case. Therefore, his claims against these defendants in their official capacity, are all barred for lack of subject matter jurisdiction.

The State of Alabama and all of its services must operate through its agencies, officers and employees. The courts are firm in their holdings that state agencies, officers and employees are absolutely immune from tort liability. Rutledge v. Baldwin Co. Commission, 495 So.2d 49 (Ala. 1986).

The State of Alabama, its agencies, officers and employees, in their official capacities and individually, are absolutely immune from suit. These defendants, as officers, employees and

10

agents of the Alabama Department of Corrections, are entitled to invoke sovereign immunity from

suit even though there may be some individual officials named as nominal defendants in the suit.

See Destafney v. University of Alabama, 413 So.2d 391 (Ala. 1981).

### *INDIVIDUAL CAPACITY*

To the extent that the court chooses to treat petitioners' complaint as being an "individual

capacity" suit, defendants add the following arguments and authorities.

### *Heightened Pleading Requirement*

It should first be noted that a plaintiff's pleading standard is elevated and "heightened"

when claims are made against government officials.  The Eleventh Circuit has made it clear:

> Some factual detail in the pleadings is necessary to the adjudication of § 1983
> claims.  This is particularly true in cases involving qualified immunity, where we
> must determine whether a defendant's actions violated a clearly established right.
> Accordingly, when reviewing a district court's disposition of a motion to dismiss a
> § 1983 claim on qualified immunity grounds, we are guided both by the regular
> 12(b)(6) standard and by the heightened pleading requirement.

G. J. R. Investments, Inc. v. Escambia, Florida, 132 F.3d 1359, 1367 (11th Cir. 1998).  In the

instant case, plaintiff's allegations against Defendants are conclusory at best and they do not

provide a basis for determining what, if any, constitutional violation is alleged against which

defendant, or exactly what each defendant is accused of doing or failing to do.  The plaintiff has

thus failed to meet the mandated "heightened pleading" requirement for a 1983 action.

### *Respondeat Superior*

The claims asserted against these defendants are clearly predicated on the doctrine of

*respondeat superior* and such liability does not exist.  Monell v. New York City Dept. Of Social

Services, 43 U.S. 658, 98 S.Ct. 2018, 67 L.Ed. 611 (1978); Smith V. Siegelman, 322 F.3d 1290,

1295 (11th Cir. 2003); Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999).  The theory of

*vicarious liability* or *respondeat superior*, is unavailable under Section 1983. *Farrow v. West* 320

F3d. 1235 (11thCir.2003).

## *ARTICLE V*
### *Executive Officer Immunity*

Under Article V, Section 112 of the Alabama constitution, defendants are executive

officers of the State of Alabama. *See*, <u>Hafer v. Melo</u>, 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116

L.Ed.2d 301 (1991) Defendants are shielded from suit, whether individually or in their official

capacity, as an executive officer of the State of Alabama, including any constitutional claims, by

Article I, Section 14 of the Alabama Constitution. *See*, <u>Alabama State Docks v. Saxon</u>, 631 So.2d

943, 946 (1994)("[Under] Article I, § 14, Alabama Constitution ... [s]tate officers and employees,

in their official capacities and individually, also are absolutely immune from suit when the action

is, in effect, one against the state."). This immunity extends to all the state law claims asserted by

the plaintiff. <u>Alexander v. Hatfield</u>, 652 So.2d 1142, 1143 (Ala. 1994). *Cf.*, <u>Tinney v. Shores</u>, 77

F.3d 378, 383 (11th Cir. 1986) ("Under Alabama law, both sheriffs and deputy sheriffs are

considered executive officers of the state, immune from suit under Section 14 . . . Alabama

intended for its state officers to be immune from suit.").

### *Qualified Immunity*

These defendants are entitled to qualified immunity.

Plaintiff has failed to produce any legal authority which makes it obvious to all reasonable

government actors in the defendants' shoes that "what he is doing violates federal law." *See*,

<u>Lassiter v. Alabama A & M Univ. Bd. Of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994).

("Qualified immunity protects government officials performing discretionary functions from civil

trials (and the other burdens of litigation, including discovery) and from liability if their conduct

12

violates no "clearly established statutory or constitutional rights of which a reasonable person

would have known.") *quoting*, Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73

L.Ed.2d 396 (1982); Siegert v. Gilley, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 1793, 114 L.Ed.2d

277 (1991). "A plaintiff cannot avoid the qualified immunity defense 'by referring to general

rules and to the violation of abstract 'rights'.'" Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir.

2001). Plaintiff's reliance on Marsh v. Butler County, Alabama, 268 F.3d 1014 (11th Cir. 2001), is

misplaced inasmuch as the case dictates:

> Once the affirmative defense of qualified immunity is advanced, the allegations of
> the complaint take on great importance in a lawsuit. **"Unless the plaintiff's
> allegations state a claim of violation of clearly established law, a defendant
> pleading qualified immunity is entitled to dismissal before the commencement
> of discovery."** Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2815, 86
> L.Ed.2d 411 (1985); Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 840, 133
> L.Ed.2d 773 (1996) ("At the [12(b)(6)] stage, it is the defendant's conduct as
> alleged in the complaint that is scrutinized for 'objective legal reasonableness.' ").

268 F.3d at 1022.

### *Access To Courts*

Inmate petitioner Marshall challenges the adequacy of the law library, claiming "rights" to

all sorts of equipment and services, such as computers, printers, and that he is being "…deprived

the fair access to legal materials and equipment…"

The law is well settled that prison inmates are entitled to "a reasonably adequate

opportunity to present claimed violations of fundamental constitutional rights to the courts."

***Bounds v. Smith***, 430 U.S. 817, 825 (1977). In ***Lewis v. Casey***, 518 U.S. 343 (1996), the Supreme

Court clarified and limited the right to assistance created in ***Bounds***.

Specifically, the Court held that "an inmate alleging a violation of ***Bounds*** must show

actual injury" arising from the alleged inadequacies in the law library or legal assistance program.

13

*Lewis*, 518 U.S. at 349. In identifying the specific right protected by *Bounds*, the court explained that "*Bounds* established no ... right [to a law library or to legal assistance]. The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts...*[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts .'" *Id*. At 350-351 (emphasis in original) (citations omitted). The Court further determined that *Bounds* did not require "that the State ... enable the prisoner to *discover grievances* and to *litigate effectively* once in court... To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] ... the Constitution requires." Id. at 354 (emphasis in original).

The Court likewise rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing. *Id*. at 349. Moreover, Lewis emphasizes that a *Bounds* violation is related to lack of an inmate's capability to present claims. 518 U.S. at 356. "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability – the capability of bringing contemplated challenges to sentences of conditions of confinement before the courts. When any inmate ... shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury. *Lewis*, 518 U.S. at 356. Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file non-frivolous legal claims challenging [his] convictions or conditions of confinement.... [I]t is the capability, rather than the capability of turning pages in a law library, that is the touchstone." *Id*. at 356-357. "[T]he Constitution does

14

not require that prisoners … be able to conduct generalized research, but only that they be able to present their grievances to the courts – a more limited capability that can be produced by a much more limited degree of legal assistance." *Id.* at 360.  The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their non-frivolous claims of constitutional claims of constitutional violations to the courts. *Id.* at 356.  A federal district court must "'scrupulously respect [] the limits on [its] role,' by 'not … thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.' [***Bounds***, 430] U.S. at 832-833, 97 S.Ct. at 1500." *Id.* at 363.

Marshall, quite clearly knows his way to the courthouse, and he makes no showing that he is prevented in any way from "…presenting his grievances to the government."

Marshall has failed to establish the requisite injury. ***Lewis***, 518 U.S. at 356.  Summary judgment is therefore due to be granted in favor of defendants. ***Chandler v. Baird***, 926 F.2d 1057 (11th Cir 1991).

### DELIBERATE INDIFFERENCE
#### *Medical Care \ Causal Connection \ Mere Negligence*

Petitioner claims that he was denied adequate medical treatment. Health care is not provided by the Department of Corrections, but rather by a contract medical provider, Prison Health Services.(PHS). Therefore, these defendants do not involve themselves in the daily medical decisions or medical treatment of state inmates

The language of 42 U.S.C. § 1983 requires proof of a causal connection between the purported actions or omissions of a Defendant and any constitutional deprivation of Petitioner. Jones v. Pruett & Mauldin, 851 F. 2d 1321 (11th Cir. 1988). The requisite causal connection may

be shown by the personal participation of the Corrections Defendant, a policy or custom established by a specifically identified Corrections Defendant which results in a deliberate indifference to the plaintiff's rights or a breach of a duty imposed by state or local law. Zatler v. Wainwright, 802 F. 2d 397 (11th Cir. 1986).

Petitioner's' complaint fails to specifically allege that any of these defendants had the ability to establish a custom or policy in regards to the alleged actions or omissions of the PHS personnel at the facility. Further, the complaint fails to allege a causal connection between the purported custom or policy and alleged injury or harm to Petitioner.

The government has an obligation to provide medical care to those it incarcerates. See Estelle v. Gamble, 429 U.S. 96, 103 (1976). Deliberate indifference to the serious medical needs of inmates constitutes the unnecessary and wanton infliction of pain prohibited by the Constitution. Id. at 104 (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). In Estelle, the Supreme Court held that a prison physicians' negligence in diagnosing or treating a medical condition was not sufficient to establish a claim of deliberate indifference under the Eighth Amendment. 429 U.S. at 106. Medical malpractice is not a constitutional violation simply because the victim is a prisoner (Id.).Clearly, the obvious care provided to Petitioner was neither inhumane nor involves the unnecessary and wanton infliction of pain.

Petitioner must establish acts or omissions of any Corrections Defendant sufficiently harmful to evidence deliberate indifference to serious medical needs.(Id.); see also McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999). The Supreme Court noted in Estelle that the plaintiff's primary allegation was that more should have been done to diagnose and treat a back injury. Id. at 107.  In Estelle, the Court explained, a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical

16

malpractice . . . . Id. Deliberate indifference to an inmates' serious medical needs is shown when prison officials have prevented [him] from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985).

Marshall offers nothing but bare, self-serving, conclusory allegations that he was somehow denied medical treatment. He fails to offer any evidence whatsoever as to who denied him treatment or what they did to deny him treatment. There is absolutely no evidence that any Corrections Defendant prevented Petitioner from getting medical treatment.

### DELIBERATE INDIFFERENCE
#### Prison Conditions / Cruel and Unusual Punishment

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)).

While [t]he Constitution does not mandate comfortable prisons, it does not permit inhumane ones ( Id.) (internal citations omitted). The Eighth Amendment requires prison officials to provide humane conditions of confinement; and ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmate.( Id.) (quoting Hudson v. Palmer, 468 U.S. 517, 526-57 (1984)).
"To establish a viable eighth amendment claim, the evidence must show that the measure taken inflicted unnecessary and wanton pain and suffering or was totally without penological justification." Ort at 322. Other citations omitted.

In order to succeed on a claim that prison [conditions] violated the Plaintiff's Eighth Amendment rights, Plaintiff must first prove that conditions were, objectively, sufficiently serious,

17

and that the Defendant acted with sufficiently culpable state of mind so as to constitute deliberate indifference to Plaintiff's health or safety by acting or failing to act despite knowledge of such substantial risk of serious harm. ***Stephens v. Johnson*** 83 F3d. 198 (8th Cir.1995).

However, not every governmental action affecting the interest or well-bring of a prisoner is to be scrutinized by the courts; rather, [a]fter incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Whitley, 475 U.S. at 319 (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted).

The Supreme Court, in the case of *Wilson v. Seiter*, 501 U.S. 294 (1991) at 301-05, in discussing the "deliberate indifference" standard, stated that prison officials mere negligence does not equal deliberate indifference.

See also *Riccardo v. Rausch*, 375 F.3[rd] 521, 525-27, which holds that a prison officials' failure to alleviate a significant safety risk did not rise to the level of deliberate indifference. The Riccardo court held that even if a jury could conclude that the official should have known of the risk, "reasonableness" is a negligence standard, and negligence does not give rise to an 8th Amendment claim.

A negligent act or omission will not support a claim under Section 1983. *Ray v. Foltz* 2004 WL 1144698 (11th.Cir. May 24, 2004). See also *Taylor v. Ledbetter*, 818 F2d. 791, 794 (11th.Cir. 1987).

It is deliberateness and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring control over a tumultuous cellblock. Whitley, 475 U.S. at 319.

18

With Health Inspections of 96, a population less than the rated capacity, and no serious fire inspection deficiencies, Marshall simply has no legs to stand on. Marshall has failed to demonstrate any set of facts which supports a claim that he is somehow being subjected to cruel and unusual punishment or even what the "cruel and unusual treatment" is.

## CONCLUSION

Inmate Marshall fails to assert and support any act or omission on the part of any defendant which rises to the level of a constitutional violation.

Respectfully submitted,


/s/ Neal P. Conner
NEAL P. CONNER (CONN2024)
ASSISTANT GENERAL COUNSEL


**ADDRESS OF COUNSEL:**

Alabama Department of Corrections
Legal Division
Post Office Box 301501
301 South Ripley Street
Montgomery, AL   36130-1501
(334)353-3889

19

## CERTIFICATE OF SERVICE

I do hereby certify that on the 9th day of July, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system,

And I hereby certify that I have mailed a copy of the forgoing via United States Mail properly addressed, postage prepaid first class to:

Carl V. Marshall, AIS # 110574
Red Eagle Honor Farm
1290 Red Eagle Road
Montgomery, AL  36110

/s/ Neal P. Conner
NEAL P. CONNER (CONN2024)
ASSISTANT GENERAL COUNSEL

20

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CARL V. MARSHALL, 110574,

     Plaintiff,                      :
                                   :
vs.                                 : CIVIL ACTION NO. 2:06-CV-1131-MHT
                                 :
RICHARD ALLEN, et al.,          :
                                 :
     Defendants.                 :

AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for the State of Alabama at Large,

personally appeared  Richard Naile, Correctional  Lieutenant, who being known to me and being by first

duly sworn, deposes and says the following:

My name is Richard Naile. I am currently employed with the Alabama Department of Corrections

as a Correctional Lieutenant at Red Eagle Honor Farm in Montgomery, Alabama. I am over twenty-one

years of age.

I, as the Second Shift Commander, did oversee the issue of Christmas Packages to Red Eagle

Honor Farm inmates who were eligible.  When advised that inmate Marshall's package had arrived at the

Institution, and that it was not authorized due to his having received disciplinary action, I advised inmate

Marshall the package was not authorized and would be returned. I acted as directed by my superiors

pertaining to this incident. Inmate Marshall's claim that the package was not issued based on an act of

retaliation for his legal activities is incorrect. The sole reason inmate Marshall's package was not issued

was because inmate Marshall was not eligible due to his having received disciplinary action in the form of

a behavior citation for Possession of Contraband on November 29, 2006.  I did not violate any procedure,

rule, regulation, or law by not issuing inmate Marshall the package.

I did not, nor have I ever denied inmate Marshall access to the courts. I have no knowledge of

inmate Marshall being denied access to the Law Library. I have never racially discriminated against inmate


DEFENDANT'S
EXHIBIT
second
affidavit

Marshall in any manner, means, method or way. I am unaware of inmate Marshall ever having "assisted" other inmates with their legal work. Therefore, no manner of retaliation has ever been taken by me. I have never initiated any type disciplinary action against inmate Marshall nor have I ever passed judgement on him for any action he has received. To my knowledge, the Law Library Computer hardware was never, nor has it ever been removed from the library. Inmate Marshall has never asked me for any type of "legal supplies", therefore I never denied him. However, when it was learned that abuses/misuses of the privilege and equipment were occurring, I was instructed to remove the printer cartridge until guidelines could be obtained from the Department's Legal Division. Again, I acted at the direction of my superiors. During my watch, all inmates were afforded access to the Red Eagle Law Library.

I have never knowingly subjected inmate Marshall to any state health law violations, state fire code violations, and exposure to contagious disease or the spread of such diseases. I never denied inmate Marshall proper medical care, emergency medical care or medical treatment. Inmate Marshall never advised or complained to me of any type violations pertaining to state health law violations, state fire code violation or exposure to contagious disease or the spread of such disease. Therefore, I never subjected him to unconstitutional conditions of confinement.

I did not, nor have I ever conspired, retaliated, denied, or discriminated against inmate Marshall. I have not violated any of inmate Marshall's constitutional rights.

_____
LT. RICHARD NAILE

STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

Sworn to and subscribed before me and given under my hand and official seal on this the __3rd__ day of __July__, 2007.

_____
NOTARY'S SIGNATURE

My Commission expires __8-26-07_____ (Date)

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

CARL MARSHALL, #110574                    :
                                          :
        Plaintiff,                        :
                                          :
    vs.                                   :        Case No. 2:06-CV-1131-MHT
                                          :
RICHARD ALLEN, et al.,                    :
                                          :
        Defendant                         :

## AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for the State of Alabama at Large,

personally appeared Joseph Womble who being known to me and being by me first duly sworn, deposes

and says on oath as follows:

My name is Joseph Womble. I am currently employed with the Alabama Department of Corrections as

a Correctional Captain at Red Eagle Honor Farm in Montgomery, Alabama 36110. I am over twenty-one

years of age and have personal knowledge of the facts set forth below:

Inmate Carl Marshall was eligible for a Christmas package at the time he placed the order and the

money was withdrawn from his PMOD account. Inmate Marshall received a citation on December 8, 2006,

which made inmate Marshall ineligible for the package. The criteria for inmates to meet in order to receive

a package were posted in the daily newsletter for the inmate population. All packages were handled in

accordance with Administrative Regulation 448, as directed by an email from the Commissioner's Office.

On December 18, 2006 UPS Ground picked up a package to be returned to American Commissary (see

attached receipt) in which inmate Marshall's package was included. The package was confiscated, only

because he did not meet the criteria and no other reason.

Inmate Marshall was not denied access to the courts. The printer was removed from free access to

restricted access due to misuse. I ordered supplies for the law library on January 29, 2007. The supplies

came in and were made available to the inmate population on February 1, 2007. Inmate Marshall did not

request any legal supplies from me.

Red Eagle Honor Farm has been inspected by the State Health Department and the State Fire

Marshall's Office. Both reports reflect minor discrepancies that have been corrected. Cleanliness is a top

DEFENDANT'S
EXHIBIT
2. second
Affidavit

priority at the facility. I am not aware of any illnesses that are related to any health or fire code violations. Inmate Marshall has not been subjected to any unconstitutional conditions of confinement.

I have not conspired or retaliated against Inmate Marshall, nor have I violated any of his constitutional rights. I have based all of my decisions on policies and procedures, not inmate Marshall's racial origin.

_____
JOSEPH WOMBLE

STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

Sworn to and subscribed before me and given under my hand and official seal on this the _3rd_

day of _July_____, 2007.

_____
NOTARY'S SIGNATURE

My Commission expires _8 - 26 - 2007_ (Date)

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

CARL MARSHALL, #110574     :
             :
  Plaintiff,       :
             :
  vs.          :  Case No. 2:06-CV-1131-MHT
             :
RICHARD ALLEN, et al.,    :
             :
  Defendant      :

AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for the State of Alabama at Large,

personally appeared Edwin Charles Lane who being known to me and being by me first duly sworn,

deposes and says on oath as follows:

My name is Edwin Charles Lane. I am currently employed with the Alabama Department of

Corrections as a Correctional Lieutenant at Red Eagle Honor Farm in Montgomery, Alabama 36110. I am

over twenty-one years of age and have personal knowledge of the facts set forth below.

Inmate Carl Marshall alleges that I deprived Inmate Carl Marshall of his Christmas package. Inmate

Carl Marshall alleges that I conspired to deny Inmate Carl Marshall of a Christmas package after Inmate

Carl Marshall filed a complaint against Red Eagle Honor Farm.

According to Alabama Department of Corrections Administrative Regulation 448: Inmate Mail and

Red Eagle's SOP, inmates that receive informal/formal disciplinary action during the months of November

or December are prohibited from receiving Christmas packages. Criteria for receiving a Christmas package

was provided in the newsletter in the months of October 2006 through December 2006. American

Commissary Supply delivered Inmate Marshal's Christmas Package during the month of December. The

packages received were issued according to the eligibility of the inmates. Inmate Marshal had received a

citation during the month of December for rule violation # 64, Possession of Contraband. Inmate

Marshall's locker box had an onion, and a tattoo gun inside. Contraband is defined as any item that is not

issued by the ADOC, bought from the canteen or approved in writing by the Warden. Therefore, the onion

and the tattoo gun is contraband. Disciplinary Action was initiated by Lt. Lane against inmate Marshall

for rule violation # 64 – Possession of Contraband. Inmate Marshal's Christmas Package was not



DEFENDANT'S
EXHIBIT
3 - second
affidavit

confiscated but it was returned to American Commissary Supply by UPS due to inmate Marshal not being eligible to receive his Christmas Package. I am not aware of any of inmate Marshall's legal activities, except this complaint.

Inmate Marshall alleges that Lt. Lane denied him access to the courts due to racial discrimination. The Law Library at Red Eagle Honor Farm is open from 6:00 p.m. to 9:00 p.m. The Law Library is also open at the request of an inmate provided security is available. Inmate Marshall has never requested to use the Law Library during my tour of duty. I did not discriminate against inmate Marshall due to racial origin; I am an Afro-American just as inmate Marshall is an Afro-American.

Red Eagle Honor Farm is inspected by the Alabama Department of Public Health once a year. The Health Department uses a standard form to inspect the facility. Red Eagle was inspected and given a score of 96. During my tour of duty I inspect all areas of the facility to ensure proper cleanliness and sanitation. Any discrepancies found are corrected immediately.

I have not conspired or retaliated against inmate Marshall, nor have I violated any of inmate Marshall's constitutional rights. I have based all of my decisions on policies and procedures, not inmate Marshall's racial origin.

_E Mr Charles Lane_
EDWIN CHARLES LANE


STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

Sworn to and subscribed before me and given under my hand and official seal on this the ___5TH___

day of ___July___, 2007.

_Randy Frank_
NOTARY'S SIGNATURE

My Commission expires ___01/31/2011___ (Date)



UPS Ground     S.D.P.

**Shipping Document**

See instructions on back.
Visit UPS.com® or call 1-800-PICK-UPS® (800-742-5877) for additional information.

TRACKING NUMBER

**1 SHIPMENT FROM**
SHIPPER'S UPS ACCOUNT NO.     K019 407 973 1

REFERENCE NUMBER     092611E

NAME     Red Eagle Abatement Resin

COMPANY

STREET ADDRESS     D90 Red Eagle Rd

CITY AND STATE     TELEPHONE

ZIP CODE

**2 DELIVERY TO**
NAME     Montgomery AL 36110

COMPANY     American Cumins Handy Supply

STREET ADDRESS     290 Tyler RD

CITY AND STATE     Russellville Ar

ZIP CODE     72802     Residential Delivery

DEPT./FLR.

This form not needed with UPS Internet Shipping at UPS.com

**3 WEIGHT**   WHOLE LBS ONLY   22   OVERSIZE   OS 1 ☐   OS 2 ☐   OS 3/LP ☐

**4 GROUND S.D.P. SHIPPING CHARGES**   $

**5 OPTIONAL SERVICES**   INSURED VALUE   $   AMOUNT $

**6 ADDITIONAL HANDLING CHARGE**   An Additional Handling Charge applies for certain items. See instructions.   $

C.O.D. shipping may be available at UPS.com

**7 TOTAL CHARGES**   $

**8 METHOD OF PAYMENT**   ☐ Bill Shipper   ☐ Bill Receiver   ☐ Bill Third Party   ☐ Credit Card   American Express / Discover / Diners Club / MasterCard / Visa   ☐ Check   EXP. MONTH DATE

**9 RECEIVER'S/THIRD PARTY'S UPS ACCT NO. OR MAJOR CREDIT CARD NO.**

THIRD PARTY'S COMPANY NAME

STREET ADDRESS

CITY AND STATE   ZIP CODE

SHIPPER'S SIGNATURE   X

DATE OF SHIPMENT   12-11-06

02.1295   1-04  1W

CHARGES

SHIPPER'S COPY

1
G
G+

# ALABAMA DEPARTMENT OF PUBLIC HEALTH
## FOOD ESTABLISHMENT / RETAIL FOOD STORE INSPECTION REPORT

SCORE 96

COUNTY HEALTH DEPARTMENT

LEGAL NOTICE TO THE PROPRIETOR OR MANAGER: You are respectfully notified of such violations of the Alabama State Board of Health Rules for Food Establishment Sanitation as are indicated by a circle in the Inspection Report. This report constitutes an official notice to comply with Chapter 420-3-22 of the aforesaid Rules within a period of _____ days. Failure to comply with this notice may result in cessation of food service food store operations.

| ESTABLISHMENT NAME | OWNER OR MANAGER NAME |
|---|---|
| Red Eagle Honor Farm | State of Alabama |

| ADDRESS | | |
|---|---|---|
| 1290 Red Eagle Road | Montgomery, AL 36110- | Date Prev Insp 03/31/05 |

| PERMIT NUMBER | MO. | DAY | YEAR | INSP. TIME | PERMITTED | PRIORITY CAT. | COMPLIANCE VISIT/ INSP. REQUIRED |
|---|---|---|---|---|---|---|---|
| | 04 | 10 | 06 | OUT / IN | YES ☑ NO ☐ | 01 | YES___ NO___ |

43   Jail/Prison Food Service

### MANAGEMENT AND PERSONNEL

| | | |
|---|---|---|
| 01* | Assignment of Person in Charge; Commissary used. Personnel with infections restricted, excl. No discharges from eyes, nose, mouth | |
| 02* | Hands clean; properly washed. No bare hand contact ; approved alternative. No eating, drinking, tobacco use. | 5 |
| 03* | Demonstration of knowledge: Approved course, other requirements met | +2 |
| 04 | Clean clothes; Hair restraints; Nails, Authorized personnel. Other. | |

### FOOD

| | | |
|---|---|---|
| 05* | Safe; Source; Condition: Not adulterated; Shellstock tags; Compliance with plan/ROP. Other. | |
| 06* | Potentially hazardous food meet temperature requirements during receiving, cooking, hot holding, cooling. Pasteurized eggs used if required. | |
| 07* | Potentially hazardous food meets temperature requirements during cold holding. Time as a public health control. Consumer Advisory used if required. | |
| 08* | Food separated, protected from contamination. Tasting, Returned, reservice of food. | 8 |
| 09 | Cooling methods. Facilities to maintain product temperature. Plant food cooking. | 1 |
| 10 | Properly labeled; Original container. Records. Code data limits. | 1 |
| 11 | Thermometers provided, accurate, conspicuous. | 1 |
| 12 | Approved thawing methods used. | 1 |
| 13 | Food contamination prevented during storage, preparation, handling, other. use prep to thaw | 1 |
| 14 | In use, between use, food/ice dispensing utensils properly st | |

### EQUIPMENT, UTENSILS, AND LINENS

| | | |
|---|---|---|
| 15* | Equipment; food contact surfaces (non-cooking) clean; san... Sanitization temperature, concentration, time. | 5 |
| 16* | Food contact surfaces characteristics. Single service/use used when required. | |
| 17 | Cooking surfaces, non-food contact surfaces: clean. Frequency; Methods. | |
| 18 | Food (ice), Non-food contact surfaces: constructed, cleanable, installed, located. | |
| 19 | Warewashing facilities: designed, constructed, maintained, installed, located, operated. Accurate thermometers, Chemical test papers. | |
| 20 | Linens properly stored, dried, handled. Laun... | 1 |
| 21 | Wiping cloths; clean, use limitation | |
| 22 | Storage, handling, drying ... equipment, utensils. wet/dry | |
| 23 | Single service articles, storage, dispensing, wrapped, Use limitations. Gloves used properly. | |

### WATER, PLUMBING AND WASTE

| | | |
|---|---|---|
| 24* | Water; Source; Quality, Capacity; System; Approved | 4 |
| 25* | Sewage, grey disposal. System approved; Flushed (mobile). | 4 |
| 26* | Cross connection; Back siphonage; Backflow. | 4 |
| 27* | Handwashing facilities; Toilets; Number location | 1 |
| 28 | Water supply, Waste disposal. Approved system (fixtures), materials, design, operation; maintenance. Other liquid wastes properly disposed. Safe; sink provided. | 1 |
| 29 | Handwashing facilities: Soap, towels/drying device, use restrictions. | 2 |
| 30 | Toilet rooms constructed, supplied. | 1 |
| 31 | Refuse, recyclables, and returnables. Outdoor/indoor storage area approved. Receptacles provided; covered. Approved refuse disposal method. | 1 |

### PHYSICAL FACILITIES

| | | |
|---|---|---|
| 32* | Food contamination cleaning equipment prevented | |
| 33* | Presence of insects/rodents, other pests. Animals prohibited. | 4 |
| 34 | Pests controlled, methods approved, used. | 1 |
| 35 | Pest control devices serviced as required. | 1 |
| 36 | Premises; Free of litter, harborage. | 1 |
| 37 | Floors, walls, ceilings, attached equipment; clean. dishwasher area | |
| 38 | Lighting, Ventilation adequate. Ventilation system (filters), clean, operated. Lights shielded. Dressing rooms provided. | 1 |
| 39 | Cleaning, maintenance tools properly stored. | 1 |

### POISONOUS OR TOXIC MATERIALS

| | | |
|---|---|---|
| 40* | Toxic, poisonous items; Medicines; First aid materials stored; Labeled; Used. | |
| 41 | Other personal care/first aid items: Stored; Labeled. Toxic or poisonous materials separation; Non-toxic tracking powder. | 1 |

### OTHER

| | | |
|---|---|---|
| 42 | Permit, Report, Other properly posted. Administrative requirements. HACCP plan | 1 |

RECEIVED BY: Name _____ Title Sieu Bd II

INSPECTED BY: Name Cindy Goocher

REMARKS _____

ADPH-FLP-103;Rev. 11-04-kw

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

CARL MARSHALL, #110574        :
                               :
     Plaintiff,              :
                               :
     vs.                   :     Case No. 2:06-CV-1131-MHT
                               :
RICHARD ALLEN, et al.,        :
                               :
     Defendant           :

## AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Jerry Odom who being known to me and being by me first duly sworn, deposes and says on oath as follows:

My name is Jerry Odom. I am currently employed with the Alabama Department of Corrections as a Correctional Officer at Red Eagle Honor Farm in Montgomery, Alabama 36110. I am over twenty-one years of age and have personal knowledge of the facts set forth below.

All computer equipment for Red Eagle Honor Farm has been placed in the Law Library and is working correctly. The equipment has not been removed from the Law Library since being placed there.

I have no knowledge of Inmate Marshall being retaliated against for filing complaints against state officials. It is against Red Eagle Honor Farm's SOP for one inmate to do another inmate's legal work. However, I have no knowledge of inmate Marshall being retaliated against.

I have no knowledge of Inmate Marshall being retaliated against by myself for exercising his 1st and 6th amendment rights under the constitution. And there have been no conspiracy against Inmate Marshall.

All inmates at Red Eagle Honor Farm have access to the Law Library no matter what race or color. All computer equipment for Red Eagle Honor Farm Law Library and all hardware are in the Law Library working to its fullest.

Red Eagle Honor Farm has a fully operational Law Library. This seems to be the extent of the


DEFENDANT'S
EXHIBIT
4

complaints against me that were filed by Inmate Marshall. I deny all allegations of racism, retaliation, and conspiracy against Inmate Marshall. I have not and will not violate any of Inmate Marshall's well established Constitutional Rights.

_____ COI
JERRY ODOM


STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

Sworn to and subscribed before me and given under my hand and official seal on this the __7th__

day of __February__, 2007.

_____
NOTARY'S SIGNATURE

My Commission expires __8 – 26 – 07__ (Date)

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

CARL MARSHALL, #110574            :
:
     Plaintiff,                  :
:
     vs.                         :        Case No. 2:06-CV-1131-MHT
:
RICHARD ALLEN, et al.,            :
:
     Defendant                   :

### AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for the State of Alabama at Large,

personally appeared Charles Hadley who being known to me and being by me first duly sworn, deposes

and says on oath as follows:

My name is Charles Hadley. I am currently employed with the Alabama Department of Corrections as

a Warden II at Red Eagle Honor Farm in Montgomery, Alabama 36110. I am over twenty-one years of age

and have personal knowledge of the facts set forth below.

Inmate Carl Marshall was denied his Christmas package in accordance with established guidelines.  I

have not conspired or retaliated against Inmate Marshall, nor have I violated any of his constitutional

rights.  Inmate Marshall has never been denied access to courts at Red Eagle Honor Farm.  I have not

made any decisions based on Inmate Marshall's racial origin.  Cleanliness is a top priority at this facility.  I

am not aware of any illnesses or injuries related to any health or fire code violations.

_____
CHARLES HADLEY

STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

Sworn to and subscribed before me and given under my hand and official seal on this the __15th__

day of __February__ , 2007.

_____
NOTARY'S SIGNATURE

My Commission expires __8-26-2007__ (Date)

DEFENDANT'S
EXHIBIT
5

INMATE _Carl Marshall (B/W)_ AIS: _1105 74_ DC I/BED #: _A-62_

FACILITY: _Red Eagle Honor Farm_ Job Assgmt: _ACI - 11_ Custody: _Min_

The above named inmate is cited by _COI D. Holmes_ for the following

Rule #_64_ violation(s) of Institutional / departmental rule(s) as described: _You inmate Carl Marshall B/W 110574 did have in your locker box #62 (1) onion, (1) tatoo motor (1) small plastic wrap which contained sugar when searched by COI Holmes. Since these items are unauthorized (1) onion + (1) tatoo motor and not sold on the store as sugar is not sold on the store wrapped in plastic this_

Date of Infraction: _11-29-06_        Time of Infraction: _11:27 am_

_Place you in rule violation # 64 Possession of Contraband._

Location of Infraction: _Dorm A-Bed #62_

_COI D. Holmes_
Citing Employee / typed name / rank

_COI Delena Holmes_
Citing Employee's Signature / Date

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I have investigated the circumstances surrounding this citation and recommend that the following sanction(s) be taken against this inmate:

( )  Counseling/Warning        (✓) Loss of Telephone privileges for _30_ days

(✓)  Loss of Canteen Privileges for _30_ days        ( ) Removal from Incentive Program

(✓)  Loss of Visiting Privileges for days _30_        ( ) Removal from Hobby Crafts Program

( )  Extra duty for _____ days at _____ hours per day under supervision of _____ shift

_INMATE REFUSE to Sign 30 nov 06_        _COI Mach c. cell_  _Lt Edmonson 11-30-06_
Inmates Signature / AJS / Date        Shift Supervisor Signature / Date

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

After having reviewed this citation and the recommendation sanction(s) presented, the following action is approved:

( ✓ )  Citation and sanctions are approved.

( )  Citation and sanctions are approved as modified: _____

( )  Citation and sanctions are disapproved and formal disciplinary action is to be immediately initiated under the provisions of ADOC AR 403.

( )  Citation and sanctions are disapproved. Expunge action from inmate's file.

_____        _Joseph Wambo  12/5/06_
Effective Date of Sanctions        Warden / Designee's Signature / Date

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Inmate receipt of completed action: _Inmate Refused to Sign (Lena Shepherd COI)_

Serving Officer's Initials: _LS_        Inmate's Signature / AJS / Date  _12/5/06_

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Distribution: ( ) Captain    ( ) Shift Commander _____ shift    ( ) Business Office
( ) ICS (as required)    ( ) Psychologist    ( ) Classification    ( ) Central Records    ( ) File

DEFENDANT'S EXHIBIT
6

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS

# INCIDENT REPORT

| 1. Institution: **Red Eagle Honor Farm** | 2. Date: **11-29-06** | 3. Time: **11:20 AM** | 4. Incident Number: **RE-06-571** | Class Code: **C** |
|---|---|---|---|---|

| 5. Location Where Incident Occurred: **Dorm A Bed #62** | 6. Type of Incident: **#64 Possession of Contraband** |
|---|---|

| 7. Time Incident Reported: **11:25 AM** | 8. Who Received Report: **Lt. Edwin Lane** *Lt Edwin Lane* |
|---|---|

9. Victims:                    Name                                         AIS

a. **NA** _____    No. _____
b. _____           No. _____
c. _____           No. _____

| 10. Suspects:   Name            AIS | 11. Witnesses:   Name            AIS |
|---|---|
| a. **Carl Marshall**   No. **B/110574** | a. **NA**   No. _____ |
| b. **Henry Bailey**   No. **B/212529** | b. _____   No. _____ |
| c. _____   No. _____ | c. _____   No. _____ |
| d. _____   No. _____ | d. _____   No. _____ |
| e. _____   No. _____ | e. _____   No. _____ |
| f. _____   No. _____ | f. _____   No. _____ |
| g. _____   No. _____ | g. _____   No. _____ |

**PHYSICAL EVIDENCE:**
12. Type of Evidence:

   **(1) Onion, (1) wrapped small bag of sugar, (1) tattoo motor**

13. Description of Evidence:

   **(1) brown onion, (1) plastic wrapped bag of sugar; approximately 3 ounces, in clear plastic, (1) gray battery powered motor approximately 2 inches long, approximately 1 inch wide.**

14. Chain of Evidence:

a   **Locker Box #62**
b   **COI Debra Holmes**
c   **Disposed of according to Admin. Reg. 306**
d   _____
e   _____

15. Narrative Summary:

**On 11-29-06 at approximately 11:20 AM COI D. Holmes, while walking in Dorm-A COI, D. Holmes noticed what appeared to be a cell phone charger plugged into the wall behind Bed #62, which is occupied by Inmate Carl Marshall B/110574. As COI D. Holmes unplugged the charger she noticed that the charger cord was coming from the inside of a sock which was in the jacket pocket, which had laundry ID number 322 marked on the front of the jacket, which was hanging on Bed #61. The jacket was found to belong to Inmate Henry Bailey B/212529. The total contents of the sock revealed to be (1) cell phone (LG), silver and blue in color, (1) blue cell phone case and (1) black cell phone clip. COI D. Holmes advised Lt. Edwin Lane via radio at approximately 11:23 AM to report to A-Dorm. At approximately 11:24 AM Lt. Lane arrived in Dorm-A and was apprised of the cell phone and accessories. Lt. Lane confiscated the cell phone and accessories. Per Lt. Lane Bed #61 and #62 were to be searched. COI D. Holmes began searching Bed #61 where under the mattress (1) bag of sugar, (1) bag of raisins and a small amount of powdered cheese. A search of Box #61 revealed no contraband. COI D. Holmes then began looking behind Bed #62 where she discovered a large brown bag containing (11) small bags of sugar and (1) can of Bartlett pears. Further discovering (2) Kool-aid containers which contained fermented fruit. COI D. Holmes then advanced to Box #62 which was locked. COI D. Holmes radioed Lt. Lane to seek permission to get the pass key to the lock. Per Lt. Lane COI D. Holmes could use the pass key to open Box #62, which is the resident of Carl Marshall B/110574. Upon opening Box #62 COI D. Holmes found (1) onion, (1) tattoo motor and (1) small bag of sugar. At approximately 11:30 AM Lt. Lane, the on-duty supervisor was apprised of the contraband. The contraband will be disposed of according to Admin. Reg. 306. Inmate Carl Marshall will receive a citation for Rule #64 – Possession of Contraband.**

*COI D. Holmes*
**COI D. Holmes**

```
FEB. 14, 2007            USER: HAZEL HARSEY                    INMACI
       INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

  AIS#:  110574    NAME: MARSHALL, CARL          CURRENT BAL:      $20.82

DATE OF     PREVIOUS   TRANS.  NAME OF            TYPE OF      TRANS.    AMOUNT
TRANS.      BALANCE    NUMBER  SENDER/PAYEE       TRANS.       AMOUNT    DEDUCTED
-------------------------------------------------------------------------------
11/13/2006     $0.77   000964  D.O.C. INDUSTRY    MISC. DEP     $3.90     $0.00
11/13/2006     $4.67   001007  D.O.C. INDUSTRY    MISC. DEP     $4.80     $0.00
11/13/2006     $9.47   001019  D.O.C. INDUSTRY    MISC. DEP     $0.90     $0.00
11/13/2006    $10.37   001028  D.O.C. INDUSTRY    MISC. DEP     $8.70     $0.00
11/13/2006    $19.07   001053  D.O.C. INDUSTRY    MISC. DEP     $2.40     $0.00
11/13/2006    $21.47   001088  D.O.C. INDUSTRY    MISC. DEP     $7.20     $0.00
11/13/2006    $28.67   001093  D.O.C. INDUSTRY    MISC. DEP    $12.00     $0.00
11/13/2006    $40.67   001105  D.O.C. INDUSTRY    MISC. DEP     $3.90     $0.00
11/14/2006    $44.57   001150  ARTHUR MARSHALL    MISC. DEP   $110.00     $0.00
11/15/2006   $154.57   001510  PMOD ACCOUNT       CANTEEN SL   $35.91     N/A
11/15/2006   $118.66   001511  PMOD ACCOUNT       CANTEEN SL   $22.94     N/A
11/16/2006    $95.72   001659  PMOD ACCOUNT       CANTEEN SL    $3.09-    N/A
11/27/2006    $98.81   000211  AMERICAN COMMISSARY MISC. WDRL  $81.55     N/A

       MORE TRANSACTIONS ON FILE

          PRESS ENTER TO CONTINUE

  FEB. 14, 2007            USER: HAZEL HARSEY                    INMACI
       INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

  AIS#:  110574    NAME: MARSHALL, CARL          CURRENT BAL:      $20.82

DATE OF     PREVIOUS   TRANS.  NAME OF            TYPE OF      TRANS.    AMOUNT
TRANS.      BALANCE    NUMBER  SENDER/PAYEE       TRANS.       AMOUNT    DEDUCTED
-------------------------------------------------------------------------------
11/29/2006    $17.26   001817  PMOD ACCOUNT       CANTEEN SL   $16.78     N/A
12/18/2006     $0.48   001743  D.O.C. INDUSTRY    MISC. DEP    $28.20     $0.00
12/18/2006    $28.68   001784  D.O.C. INDUSTRY    MISC. DEP     $4.80     $0.00
12/18/2006    $33.48   001789  D.O.C. INDUSTRY    MISC. DEP     $7.80     $0.00
12/18/2006    $41.28   001809  D.O.C. INDUSTRY    MISC. DEP     $1.80     $0.00
12/18/2006    $43.08   001821  D.O.C. INDUSTRY    MISC. DEP     $0.90     $0.00
12/18/2006    $43.98   001844  D.O.C. INDUSTRY    MISC. DEP     $0.30     $0.00
12/18/2006    $44.28   001851  D.O.C. INDUSTRY    MISC. DEP     $1.20     $0.00
12/18/2006    $45.48   001871  D.O.C. INDUSTRY    MISC. DEP     $0.60     $0.00
01/04/2007    $46.08   002878  PMOD ACCOUNT       CANTEEN SL   $26.03     N/A
01/04/2007    $20.05   002879  PMOD ACCOUNT       CANTEEN SL   $13.25     N/A
01/05/2007     $6.80   002974  PMOD ACCOUNT       CANTEEN SL    $1.99     N/A
01/10/2007     $4.81   002320  ARTHUR MARSHALL    MISC. DEP    $20.00     $0.00

       MORE TRANSACTIONS ON FILE

          PRESS ENTER TO CONTINUE

  FEB. 14, 2007            USER: HAZEL HARSEY                    INMACI
       INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

  AIS#:  110574    NAME: MARSHALL, CARL          CURRENT BAL:      $20.82

DATE OF     PREVIOUS   TRANS.  NAME OF            TYPE OF      TRANS.    AMOUNT
TRANS.      BALANCE    NUMBER  SENDER/PAYEE       TRANS.       AMOUNT    DEDUCTED
-------------------------------------------------------------------------------
01/10/2007    $24.81   003094  PMOD ACCOUNT       CANTEEN SL    $4.98     N/A
01/11/2007    $19.83   003210  PMOD ACCOUNT       CANTEEN SL   $19.83     N/A
01/22/2007     $0.00   002487  D.O.C. INDUSTRY    MISC. DEP     $2.40     $0.00
01/22/2007     $2.40   002504  D.O.C. INDUSTRY    MISC. DEP    $21.60     $0.00
01/22/2007    $24.00   002540  D.O.C. INDUSTRY    MISC. DEP     $1.20     $0.00
01/22/2007    $25.20   002559  D.O.C. INDUSTRY    MISC. DEP    $13.20     $0.00
01/25/2007    $38.40   003553  PMOD ACCOUNT       CANTEEN SL   $23.93     N/A
01/25/2007    $14.47   003534  PMOD ACCOUNT       CANTEEN SL    $4.92     N/A
01/25/2007     $9.55   003666  PMOD ACCOUNT       CANTEEN SL    $9.45     N/A
02/07/2007     $0.10   002933  ARTHUR MARSHALL    MISC. DEP    $30.00     $0.00
02/08/2007    $30.10   004139  PMOD ACCOUNT       CANTEEN SL    $6.59     N/A
02/08/2007    $23.51   004143  PMOD ACCOUNT       CANTEEN SL    $2.69     N/A
          END OF DATA ON MARSHALL, CARL
```

```
FEB. 14, 2007              USER: HAZEL HARSEY                    INMACI
         INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

    AIS#:   110574    NAME: MARSHALL, CARL            CURRENT BAL:      $20.82
```

| DATE OF TRANS. | PREVIOUS BALANCE | TRANS. NUMBER | NAME OF SENDER/PAYEE | TYPE OF TRANS. | TRANS. AMOUNT | AMOUNT DEDUCTED |
|---|---|---|---|---|---|---|
| 11/13/2006 | $0.77 | 000964 | D.O.C.  INDUSTRY | MISC. DEP | $3.90 | $0.00 |
| 11/13/2006 | $4.67 | 001007 | D.O.C.  INDUSTRY | MISC. DEP | $4.80 | $0.00 |
| 11/13/2006 | $9.47 | 001019 | D.O.C.  INDUSTRY | MISC. DEP | $0.90 | $0.00 |
| 11/13/2006 | $10.37 | 001028 | D.O.C.  INDUSTRY | MISC. DEP | $8.70 | $0.00 |
| 11/13/2006 | $19.07 | 001053 | D.O.C.  INDUSTRY | MISC. DEP | $2.40 | $0.00 |
| 11/13/2006 | $21.47 | 001088 | D.O.C.  INDUSTRY | MISC. DEP | $7.20 | $0.00 |
| 11/13/2006 | $28.67 | 001093 | D.O.C.  INDUSTRY | MISC. DEP | $12.00 | $0.00 |
| 11/13/2006 | $40.67 | 001105 | D.O.C.  INDUSTRY | MISC. DEP | $3.90 | $0.00 |
| 11/14/2006 | $44.57 | 001150 | ARTHUR MARSHALL | MISC. DEP | $110.00 | $0.00 |
| 11/15/2006 | $154.57 | 001510 | PMOD ACCOUNT | CANTEEN SL | $35.91 | N/A |
| 11/15/2006 | $118.66 | 001511 | PMOD ACCOUNT | CANTEEN SL | $22.94 | N/A |
| 11/16/2006 | $95.72 | 001659 | PMOD ACCOUNT | CANTEEN SL | $3.09- | N/A |
| 11/27/2006 | $98.81 | 000211 | AMERICAN COMMISSARY | MISC. WDRL | $81.55 | N/A |

```
         MORE TRANSACTIONS ON FILE

              PRESS ENTER TO CONTINUE
```

```
FEB. 14, 2007              USER: HAZEL HARSEY                    INMACI
         INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

    AIS#:   110574    NAME: MARSHALL, CARL            CURRENT BAL:      $20.82
```

| DATE OF TRANS. | PREVIOUS BALANCE | TRANS. NUMBER | NAME OF SENDER/PAYEE | TYPE OF TRANS. | TRANS. AMOUNT | AMOUNT DEDUCTED |
|---|---|---|---|---|---|---|
| 11/29/2006 | $17.26 | 001817 | PMOD ACCOUNT | CANTEEN SL | $16.78 | N/A |
| 12/18/2006 | $0.48 | 001743 | D.O.C.  INDUSTRY | MISC. DEP | $28.20 | $0.00 |
| 12/18/2006 | $28.68 | 001784 | D.O.C.  INDUSTRY | MISC. DEP | $4.80 | $0.00 |
| 12/18/2006 | $33.48 | 001789 | D.O.C.  INDUSTRY | MISC. DEP | $7.80 | $0.00 |
| 12/18/2006 | $41.28 | 001809 | D.O.C.  INDUSTRY | MISC. DEP | $1.80 | $0.00 |
| 12/18/2006 | $43.08 | 001821 | D.O.C.  INDUSTRY | MISC. DEP | $0.90 | $0.00 |
| 12/18/2006 | $43.98 | 001844 | D.O.C.  INDUSTRY | MISC. DEP | $0.30 | $0.00 |
| 12/18/2006 | $44.28 | 001851 | D.O.C.  INDUSTRY | MISC. DEP | $1.20 | $0.00 |
| 12/18/2006 | $45.48 | 001871 | D.O.C.  INDUSTRY | MISC. DEP | $0.60 | $0.00 |
| 01/04/2007 | $46.08 | 002878 | PMOD ACCOUNT | CANTEEN SL | $26.03 | N/A |
| 01/04/2007 | $20.05 | 002879 | PMOD ACCOUNT | CANTEEN SL | $13.25 | N/A |
| 01/05/2007 | $6.80 | 002974 | PMOD ACCOUNT | CANTEEN SL | $1.99 | N/A |
| 01/10/2007 | $4.81 | 002320 | ARTHUR MARSHALL | MISC. DEP | $20.00 | $0.00 |

```
         MORE TRANSACTIONS ON FILE
```

PRESS ENTER TO CONTINUE

FEB. 14, 2007                    USER: HAZEL HARSEY                              INMACI
        INMATE ACCOUNT INFORMATION FROM OCT. 01, 2006 THRU FEB. 14, 2007

    AIS#:    110574      NAME: MARSHALL, CARL           CURRENT BAL:        $20.82

| DATE OF TRANS. | PREVIOUS BALANCE | TRANS. NUMBER | NAME OF SENDER/PAYEE | TYPE OF TRANS. | TRANS. AMOUNT | AMOUNT DEDUCTED |
|---|---|---|---|---|---|---|
| 01/10/2007 | $24.81 | 003094 | PMOD ACCOUNT | CANTEEN SL | $4.98 | N/A |
| 01/11/2007 | $19.83 | 003210 | PMOD ACCOUNT | CANTEEN SL | $19.83 | N/A |
| 01/22/2007 | $0.00 | 002487 | D.O.C.  INDUSTRY | MISC. DEP | $2.40 | $0.00 |
| 01/22/2007 | $2.40 | 002504 | D.O.C.  INDUSTRY | MISC. DEP | $21.60 | $0.00 |
| 01/22/2007 | $24.00 | 002540 | D.O.C.  INDUSTRY | MISC. DEP | $1.20 | $0.00 |
| 01/22/2007 | $25.20 | 002559 | D.O.C.  INDUSTRY | MISC. DEP | $13.20 | $0.00 |
| 01/25/2007 | $38.40 | 003533 | PMOD ACCOUNT | CANTEEN SL | $23.93 | N/A |
| 01/25/2007 | $14.47 | 003534 | PMOD ACCOUNT | CANTEEN SL | $4.92 | N/A |
| 01/25/2007 | $9.55 | 003666 | PMOD ACCOUNT | CANTEEN SL | $9.45 | N/A |
| 02/07/2007 | $0.10 | 002933 | ARTHUR MARSHALL | MISC. DEP | $30.00 | $0.00 |
| 02/08/2007 | $30.10 | 004139 | PMOD ACCOUNT | CANTEEN SL | $6.59 | N/A |
| 02/08/2007 | $23.51 | 004143 | PMOD ACCOUNT | CANTEEN SL | $2.69 | N/A |

                    END OF DATA ON MARSHALL, CARL

**STATE OF ALABAMA**
**Red Eagle Honor Farm**
**1290 Red Eagle Road**
**Montgomery, Alabama 36110**

**STANDARD OPERATING PROCEDURE**                    **OPR: Warden**

**09 - 05**

## Emergency Fire Procedures

### I.   GENERAL

This Alabama Department of Corrections (ADOC) Institutional Standard Operating

Procedure (SOP) establishes the responsibilities, policies, and procedures for all

employees and inmates at Red Eagle Honor Farm.

### II.   POLICY

It is the policy of Red Eagle Honor Farm that all employees will be familiar with and

follow the procedures set forth in this Standard Operating Procedure.

### III.   DEFINITION (S) AND ACRONYM (S)

**Yellow Fire Alert**:  The yellow fire alert will be placed in effect when there is a small

controllable fire of a non-threatening nature.

**Red Fire Alert**:  The red alert will be placed in effect when there is a major

uncontrollable fire that is life threatening.

### IV.   RESPONSIBILITIES

1



DEFENDANT'S
EXHIBIT
7

All employees of Red Eagle Honor Farm are responsible to keep all areas in such a manner that will prevent fires. Any employee discovering a fire is responsible for notifying the shift commander. The shift commander is responsible for evaluating the situation and determines what action needs to be taken. The shift commander is responsible for conducting a fire drill monthly (third shift will conduct a simulated fire drill) and documenting the fire drill on an incident report.

A.   Warden:

  1.   The Warden will be the Official –in-Charge (OIC).

  2.   The Warden is responsible for overseeing the entire application of the fire plan.

  3.   The Warden will coordinate all aspects and provisions of the plan and delegate specific responsibilities.

  4.   The Warden has appointed the Maintenance Supervisor as the Fire Safety Officer.

B.   Captain of the Guard:

  1.   The Captain will assume the role of OIC in the absence of the Warden.

  2.   The Captain is responsible with all outside agencies, such as County Fire Departments, the Sheriffs office, and other institutional personnel that are assisting.

  3.   The Captain will coordinate all operations with the command Center and maintain clear and open communication between the security staff engaged in the implementation of the Fire Plan.

C.    Shift Commander

    1.  The Shift Commander is responsible for the overall command of the emergency until the arrival of the Warden or Captain.

    2.  The Shift Commander is responsible for overseeing the operation and insuring that the proper records and logs are kept.

    3.  The Shift Commander will be responsible for coordinating the emergency plans and insuring their effectiveness.

V.    **<u>PROCEDURES</u>**

A.    Shift Commander

    1.  Upon notification of a fire, the Shift Commander will instruct the appropriate staff member to visually verify the fire and obtain a verbal report to determine the exact size, nature and location of the fire.

    2.  The Shift Commander will then determine if this plan is to be implemented and declare the appropriate alert level for the fire.

    3.  The Shift Commander will sound the fire alarm, if necessary, and evacuate the dormitories to the area behind the smoking area and administrative offices to the front parking lot. (See attachments for evacuation routes and meeting areas.). A formal count will be conducted once the evacuation is complete. All personnel and inmates will be accounted for.

    4.  The Shift Commander will instruct an officer to begin emergency notifications and begin a detail log of events.

5.  The Shift Commander will determine if the fire can be extinguished without the assistance of the fire department, if not contact the Montgomery Fire Department Station #8 located on Lower Wetumpka Road at 832-4469 or dial 911.

6.  The Shift Commander will notify the Warden, Captain, and Maintenance Supervisor.

B.  Officers

1.  The Officers will unlock all exit doors and ensure all inmates and personnel exit the buildings.

2.  The Officers will notify the Shift Commander when the evacuation is completed.

3.  The officers will conduct a count of inmates and inmates will stay grouped by dormitories.

4.  An Officer will remain with the inmates to ensure security.

5.  The other Officers will report to the Shift Commander for further instructions.

C.  Support Personnel:

1.  All support personnel will evacuate the building and report to the front parking lot.

2.  Support Personnel will evacuate through the side door if possible. The Secondary Route will be to exit through the Shift Office.

D.  Maintenance Personnel

4

1.  Maintenance will assist the Shift Commander in interrupting utilities and provide assistance to the Shift Commander as needed.

2.  Maintenance will test Fire Equipment monthly, to include fire extinguishers and pressure testing of hoses and turning on of Water Hydrates. Maintenance will document the testing of the equipment on a tag affixed to the equipment.

## VI.    **DISPOSITION**

Any forms will be disposed of and/or retained according to the Departmental Records Disposition Authority (RDA).

## VII.   **FORMS**

Fire Evacuation Routes
Emergency List of Telephone Numbers

## VIII.  **SUPERCEDES**

This Standard Operating Procedure supersedes SOP # 9-05 Dated 5/14/2002 Fire Safety and Weather Alerts and any memorandums to date.

## IX.    **PERFORMANCE**

None

9-18-06
_____
Date Completed

_____
C.I. Hadley, Warden
Red Eagle Honor Farm

# RED EAGLE HONOR FARM

## EVACUATION PLAN



# EMERGENCY TELEPHONE LIST

| | |
|---|---|
| **Alabama Power Company** | **334-223-5001** |
| **Bellsouth** | **800-247-2020** |
| **Black Box   (Customer # 106394)** | **800-766-7687**<br>**334-409-5901** |
| **Boylston Post Office** | **334-265-1102** |
| **Ferrellgas  LP        (Propane Gas)** | **205-516-9224** |
| **Martin Damn** | **205-257-3335**<br>**800-525-3711** |
| **Montgomery Water Works** | **334-206-1600** |
| **Lagoon Post Office** | **334-279-3172** |
| **Pest Control** | **334-215-1682** |
| **Risk Management** | **334-223-6133** |
| **Southeast Alabama Gas   (Natural Gas)** | **334-382-2643** |
| **T-Netix           (Inmate Phones)** | **888-286-3849** |
| **Time and Weather** | **334-323-7000** |
| **WAKA Weather** | **334-242-3252** |

**STATE OF ALABAMA**
**Red Eagle Honor Farm**
**1290 Red Eagle Road**
**Montgomery, Alabama 36110**

**STANDARD OPERATING PROCEDURE**                    **OPR: Warden**

**09 - 05**

## Emergency Fire Procedures

I.  **GENERAL**

This Alabama Department of Corrections (ADOC) Institutional Standard Operating Procedure (SOP) establishes the responsibilities, policies, and procedures for all employees and inmates at Red Eagle Honor Farm.

II.  **POLICY**

It is the policy of Red Eagle Honor Farm that all employees will be familiar with and follow the procedures set forth in this Standard Operating Procedure.

III.  **DEFINITION (S) AND ACRONYM (S)**

**Yellow Fire Alert**:  The yellow fire alert will be placed in effect when there is a small controllable fire of a non-threatening nature.

**Red Fire Alert**:  The red alert will be placed in effect when there is a major uncontrollable fire that is life threatening.

IV.  **RESPONSIBILITIES**

1


DEFENDANT'S
EXHIBIT
7

All employees of Red Eagle Honor Farm are responsible to keep all areas in such a manner that will prevent fires. Any employee discovering a fire is responsible for notifying the shift commander. The shift commander is responsible for evaluating the situation and determines what action needs to be taken. The shift commander is responsible for conducting a fire drill monthly (third shift will conduct a simulated fire drill) and documenting the fire drill on an incident report.

A.  Warden:

   1.  The Warden will be the Official –in-Charge (OIC).

   2.  The Warden is responsible for overseeing the entire application of the fire plan.

   3.  The Warden will coordinate all aspects and provisions of the plan and delegate specific responsibilities.

   4.  The Warden has appointed the Maintenance Supervisor as the Fire Safety Officer.

B.  Captain of the Guard:

   1.  The Captain will assume the role of OIC in the absence of the Warden.

   2.  The Captain is responsible with all outside agencies, such as County Fire Departments, the Sheriffs office, and other institutional personnel that are assisting.

   3.  The Captain will coordinate all operations with the command Center and maintain clear and open communication between the security staff engaged in the implementation of the Fire Plan.

C.    Shift Commander

    1. The Shift Commander is responsible for the overall command of the emergency until the arrival of the Warden or Captain.

    2. The Shift Commander is responsible for overseeing the operation and insuring that the proper records and logs are kept.

    3. The Shift Commander will be responsible for coordinating the emergency plans and insuring their effectiveness.

## V.    PROCEDURES

A.    Shift Commander

    1. Upon notification of a fire, the Shift Commander will instruct the appropriate staff member to visually verify the fire and obtain a verbal report to determine the exact size, nature and location of the fire.

    2. The Shift Commander will then determine if this plan is to be implemented and declare the appropriate alert level for the fire.

    3. The Shift Commander will sound the fire alarm, if necessary, and evacuate the dormitories to the area behind the smoking area and administrative offices to the front parking lot. (See attachments for evacuation routes and meeting areas.).  A formal count will be conducted once the evacuation is complete.  All personnel and inmates will be accounted for.

    4. The Shift Commander will instruct an officer to begin emergency notifications and begin a detail log of events.

5. The Shift Commander will determine if the fire can be extinguished without the assistance of the fire department, if not contact the Montgomery Fire Department Station #8 located on Lower Wetumpka Road at 832-4469 or dial 911.

6. The Shift Commander will notify the Warden, Captain, and Maintenance Supervisor.

B.   Officers

1. The Officers will unlock all exit doors and ensure all inmates and personnel exit the buildings.

2. The Officers will notify the Shift Commander when the evacuation is completed.

3. The officers will conduct a count of inmates and inmates will stay grouped by dormitories.

4. An Officer will remain with the inmates to ensure security.

5. The other Officers will report to the Shift Commander for further instructions.

C.   Support Personnel:

1. All support personnel will evacuate the building and report to the front parking lot.

2. Support Personnel will evacuate through the side door if possible. The Secondary Route will be to exit through the Shift Office.

D.   Maintenance Personnel

1. Maintenance will assist the Shift Commander in interrupting utilities and provide assistance to the Shift Commander as needed.

2. Maintenance will test Fire Equipment monthly, to include fire extinguishers and pressure testing of hoses and turning on of Water Hydrates. Maintenance will document the testing of the equipment on a tag affixed to the equipment.

## VI.    DISPOSITION

Any forms will be disposed of and/or retained according to the Departmental Records Disposition Authority (RDA).

## VII.    FORMS

Fire Evacuation Routes
Emergency List of Telephone Numbers

## VIII.    SUPERCEDES

This Standard Operating Procedure supersedes SOP # 9-05 Dated 5/14/2002 Fire Safety and Weather Alerts and any memorandums to date.

## IX.    PERFORMANCE

None

9-18-06
Date Completed

C.I. Hadley, Warden
Red Eagle Honor Farm

# RED EAGLE HONOR FARM

## EVACUATION PLAN



# EMERGENCY TELEPHONE LIST

| | |
|---|---|
| **Alabama Power Company** | 334-223-5001 |
| **Bellsouth** | 800-247-2020 |
| **Black Box   (Customer # 106394)** | 800-766-7687<br>334-409-5901 |
| **Boylston Post Office** | 334-265-1102 |
| **Ferrellgas  LP        (Propane Gas)** | 205-516-9224 |
| **Martin Damn** | 205-257-3335<br>800-525-3711 |
| **Montgomery Water Works** | 334-206-1600 |
| **Lagoon Post Office** | 334-279-3172 |
| **Pest Control** | 334-215-1682 |
| **Risk Management** | 334-223-6133 |
| **Southeast Alabama Gas   (Natural Gas)** | 334-382-2643 |
| **T-Netix           (Inmate Phones)** | 888-286-3849 |
| **Time and Weather** | 334-323-7000 |
| **WAKA Weather** | 334-242-3252 |





*State of Alabama*

*Alabama Department of Corrections*

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**BOB RILEY**
GOVERNOR

**DONAL CAMPBELL**
COMMISSIONER

February 7, 2005

ADMINISTRATIVE REGULATION                    OPR:  LEGAL
NUMBER                           412

### INSTITUTIONAL LAW LIBRARIES

I.     **GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for institutional law libraries.

II.    **POLICY**

It is the policy of the ADOC to provide legal resource libraries and to permit all inmates access to the materials available.

III.   **DEFINITION(S) AND ACRONYM(S)**

CD:  Compact Disk

IV.    **RESPONSIBILITIES**

Wardens/designees are responsible for the operation and maintenance of institutional law libraries.

V.     **PROCEDURES**

A.     Destruction of or damage to law library books, CDs or materials.

1.     Any general population inmate who has been found guilty of violating Administrative Regulation 403, Disciplinary Hearing Procedures for Major Rule Violations, Rule #69 (destruction or damaging state Property) that involves the destruction or damaging of law library books, CDs or other materials, may be denied physical access to the law library for up to 30 days. During the time that physical access to the law library is denied, the inmate will be permitted to request and receive the same law library privileges as are afforded inmates confined to segregation.


DEFENDANT'S
EXHIBIT
8

2.    If an inmate confined to segregation fails or refuses to return checked-out Law library books or materials upon demand, correctional staff may enter that inmate's cell in order to retrieve the law library books or material.

3.    The institutional law library supervisor will document each incident of theft, damage, destruction or refusals to return law library books or materials.

B.    Missing books, pages, materials.

In the event that an inmate discovers that a book(s), or page(s) of a book, or other materials, are missing from the law library that are necessary to the inmate's legal research, the inmate should report this to the institutional law library supervisor by submitting Form N944L i, "Access to Legal Material".

## VI.    **DISPOSITION**

Any documents will be retained or disposed of according to the Departmental Records Disposition Authority (RDA).

## VII.    **FORMS**

Form N944L i – Access to Legal Material (Refer to AR 214)

## VIII.    **SUPERCEDES**

This Administrative Regulation supercedes AR 412 dated August 18, 1992.

## IX.    **PERFORMANCE**

A.    Administrative Regulation 214. "Law Library Supervisors"

B.    Administrative Regulation 403, "Disciplinary Hearing Procedures for Major Rule Violations."

_____
Donal Campbell, Commissioner

AR 412– February 7, 2005



# State of Alabama
# Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130



**BOB RILEY**
GOVERNOR

**DONAL CAMPBELL**
COMMISSIONER

December 19, 2005

ADMINISTRATIVE REGULATION                    OPR:  OPERATIONS
NUMBER                      448

## INMATE MAIL

## I.    GENERAL

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for inmate mail.

## II.    POLICY

It is the policy of the ADOC to allow inmate mail in accordance with the U.S. Postal Service regulations and the guidelines set forth in this regulation.

## III.    DEFINITIONS

A.    Contraband:  Any item that is not permitted by law or is either prohibited or not specifically authorized by ADOC or institutional policy. Items not issued by the ADOC, not sold on the institutional canteen, or not specifically authorized by the Warden.

B.    Correspondence:  Written communication to or from inmates (e.g., letters, post cards, greeting cards) delivered by a postal service.

C.    Inmate Personal Property:  The items and amounts of clothing, equipment, mail, or supplies, which an inmate is allowed to have in his/her immediate possession.

D.    Mail:  For the purpose of this regulation, the term "mail" includes but is not limited to: items delivered by the U.S. Postal Service, inter-institutional mail, and any private carrier servicing the ADOC.

E.    Mail Clerk:  Staff member(s) assigned to the institutional mailroom.

F.    Printed Materials:  Books, publications, magazines, newspapers, periodicals, circulars, and catalogues delivered by the postal services.

G.    Legal Mail:  Letters to and from attorneys, courts, judges, clerks, and other officials of the courts and governmental agencies.



DEFENDANT'S
EXHIBIT

9

H.  <u>Reasonable Suspicion</u>:  Rational inference that a reasonably prudent person could make from specific objective facts.

I.  <u>Internet Materials</u>:  Downloaded copy from a web site.

J.  <u>Religious Materials</u>:  Books, pamphlets, brochures, and religious study courses.

K.  <u>Nudity</u>:  A pictorial depiction where genitalia or female breasts are exposed. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.

L.  <u>Sexually Explicit</u>:  A picture/illustration of actual or simulated sexual intercourse, and/or oral sex, masturbation, or materials depicting sex.

## IV.  <u>RESPONSIBILITIES</u>

A.  The Warden shall be responsible for developing their institution/division Standard Operating Procedure (SOP) in accordance with AR 448, *Inmate Mail*.

B.  The Mail Clerk is responsible for the collection, inspection, and distribution of incoming/outgoing mail and for the maintenance of the mailroom records.

C.  The Chaplain or the Warden's designee is responsible for reviewing all mail entering the institution for an inmate that has been marked in care of the chaplain as it refers to religious materials.

## V.  <u>PROCEDURES</u>

A.  General Guidelines

1.  The inmates shall be permitted to send and receive correspondence unless it can be determined that such correspondence may present a threat to the safety and security of the public, staff, inmates, and institution.

2.  There is no limit on the volume of letters the inmate can send or receive, or on the language, content, or source of mail except when there is reasonable belief that limitation is necessary to protect the public safety or maintain institutional order.

3.  The Warden shall designate a secure mail area and drop boxes for outgoing mail accessible to all inmates.

4.  Mail between inmates, whether state, county, city, out-of-state or federal may be allowed with the permission of the Wardens involved. It must be shown that there is a close personal relationship (immediate family) between such inmates.

AR 448 – December 19, 2005

5.    Mail and packages addressed to an inmate, who has been transferred or released to another known address, should be mailed to the inmate within 48 hours, excluding weekends and holidays.

    a.    If a forwarding address is not available, such mail and packages shall be returned to the sender.

    b.    If neither a forwarding or return address is available, the mail shall be returned to the post office.

6.    All inmate mail shall remain under the supervision of staff until it is distributed. Inmates are not allowed in the mail area without supervision.

7.    At no time shall mail be distributed or handled by an inmate or be accessible to any inmate other than the addressee.

8.    A staff person shall deliver incoming mail to the inmate(s) to whom it is addressed.

**B.    Incoming Mail**

1.    All incoming mail must be addressed so as to specify the inmate's name, inmate AIS number, and location within the institution.

2.    An inmate who has legally changed their name and chooses to use the legal name, then dual names are required in the following format: Commitment Name, AIS # XXXXXX, Legal Name.  (See AR 450, *Legal Name Changes)*

3.    Promotional checks will not be accepted through the mail for deposit to inmate accounts.

4.    Correspondence, printed material, inmate personal property, or money will not be hand delivered to inmates by visitors. The Warden/designee may allow attorneys to hand deliver "Legal Mail" directly to the inmate, subject to being searched for contraband.

5.    Inmate will not receive mail stamped "Collect on Delivery (COD)."

**C.    Outgoing Mail**

1.    All mail being sent from the institution must have a return address which will include: inmate's full name, inmate AIS number, name of institution, dorm/cell number, street address or P. O. Box number as appropriate, city, state, and zip code. Additionally, the following stamped disclaimer will be included on every piece of outgoing mail sent by inmates.

"This correspondence if forwarded from Alabama State Prison. The contents have not been evaluated, and the ADOC is not responsible for the substance or content of the enclosed communication."

2.   An inmate who has legally changed their name and chooses to use the legal name, then dual names are required in the following format: Commitment Name, AIS # XXXXXX, Legal Name. (See AR 450, *Legal Name Changes)*

3.   Designated staff should collect outgoing mail once each business day.

D.   Legal Mail

1.   Outgoing

a.   Inmates will be provided two (2) free stamps per week for **legal mail** only.

b.   Each Warden shall designate a box for "Legal Mail."

2.   Incoming

a.   A bound ledger shall be maintained by mailroom staff that lists each piece of legal mail received, the date inspected, delivered, and recipient's signature.

b.   The inmate will sign for all "Legal Mail" prior to receipt.

c.   All "Legal Mail" will be opened and inspected in the presence of the inmate.

E.   Limitations

1.   When abuses are found, the Warden may prohibit further correspondence by the inmate with the person to whom the offending material was directed.

2.   When the Warden receives a request to terminate correspondence with an inmate, the Warden shall notify the inmate of the request and inform the inmate that further correspondence with the individual shall cease.

3.   The Warden/designee will provide documentation that will be placed in the mail area and in the inmate's institutional file of persons with whom the inmate may no longer correspond.

AR 448 – December 19, 2005

F.   Inspection

    1.   Incoming mail, including "Legal Mail", shall be inspected for contraband and/or for abuse of the mail privilege. Outgoing mail may be inspected for contraband.

    2.   All contraband will be disposed of in accordance with AR 306, *Contraband and Evidence Management*.

    3.   Every effort should be made to ensure that all incoming letters and packages are delivered within 72 hours after receipt at the institution, other than weekends and holidays. Inmates will be notified of rejected mail in accordance with procedures contained in V.G.

G.   Rejection

    1.   In the event any incoming mail is rejected, the mail clerk will cite the policy violation and complete an ADOC Form 448, *Notification of Rejected Mail,* then forward to the inmate in a timely manner.

    2.   An inmate may appeal the rejection to the Warden/designee for review and final determination. (Refer to ADOC Form 448, *Notification of Rejected Mail*).

    3.   If the appeal is denied, the inmate will have the option of returning the mail to the sender at his/her own expense within 30 days, or the property will be destroyed at the end of the 30-day period.

    4.   Incoming mail may be determined to be a threat to the security of the institution and returned to the sender if, in the opinion of the Warden, it could reasonably be considered to:

        a.   Be an attempt to incite violence based on race, religion, sex, creed, or nationality.

        b.   Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, and rebellion against government authority.

        c.   Be an attempt to incite disobedience toward law enforcement officials or correctional staff.

        d.   Be an attempt to give instructions for the manufacturing or use of intoxicants, weapons, explosives, drugs, drug paraphernalia, or other unlawful items or substance.

        e.   Contain obscene photographs, pictures, or drawings, including publications and advertisements from distributors.

AR 448 – December 19, 2005

    f.    Contain plans to escape, unauthorized entry into the institution, or information or maps, which might aid an escape attempt.

    g.    Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.

    h.    Contain materials specifically found to be detrimental to inmate rehabilitation because it could encourage deviate criminal sexual behaviors.

    i.    Publications that contain, nudity, graphic depictions of homosexuality, sadomasochism, bestiality, incest, or sex with children will be denied.

    j.    Publications that primarily cover the activities of any sexual or political rights groups or organizations will normally be admitted.

    k.    Before delivery of a publication may be denied, the Warden/designee must review the particular publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behavior. It is not necessary to find that the particular recipient is likely to personally engage in such behavior before delivery can be denied.

5.    Abuse of mail privileges by inmates may result in rejection and possible disciplinary action. Abuses included but are not limited to the following:

    a.    The writing of letters containing obscene, profane, or indecent language.

    b.    Writings that contain threats, derogatory or personal attack against any person.

    c.    Writings that contain an escape plot or any other clear threats to the institution.

    d.    Receipt of mail, identified as legal mail, from any individual or agency not meeting the legal mail definition.

    e.    Writing which contain language purporting to solicit, claim, or demand money, goods, or services by false statements, threats, intimidation or extortion from another person or firm is prohibited.

    f.    Any written material in outgoing or incoming mail not specifically intended for the addressee identified on the exterior of the

AR 448 – December 19, 2005

envelope, i.e. sending mail with contents addressed to another party for forwarding which constitutes mail kiting.

H.    Publications/Books

1.    Inmates may receive no more than two books per month and four magazines or newspapers or a combination thereof. (Refer to AR 338, *Inmate Property*, for the number of items an inmate may have in his/her possession at one time.)

2.    The publications should be received directly from the publisher or a recognized commercial distributor and be pre-paid from a family member or friend or from the inmate's Prisoners Money on Deposit Account (PMOD).

3.    Receipt of publications by inmates in segregation will be determined by provision indicated in AR 433, *Administrative Segregation and Housing for Close or Maximum Custody*, and AR 434, *Disciplinary Segregation*.

4.    Each Warden/designee shall personally inspect each issue of a publication when a reasonable expectation that the particular issue violates the standards of this regulation. If they determine that the issue of the publication violates these standards then they will temporarily exclude the publication.

5.    The Warden/designee shall notify the inmate to whom the publication was addressed of the temporary ban.

6.    If the inmate appeals the temporary ban, it will remain in effect pending a final resolution. Upon notice of the appeal, the Warden will furnish a copy of the documentation on the matter to the Commissioner/designee. This documentation will include copies of pages of the excluded issue that contain material that has been identified as violating the restrictions.

7.    The Commissioner/designee will review the action taken by the institution to exclude that issue and either confirm or deny them. If the temporary ban is confirmed, the inmate, the Warden, and all other institutions will be notified, the issue is permanently banned, and the matter closed. The documentation supporting the ban will be retained by the Legal Division and at the institution.

8.    If the temporary ban is denied, the publication will be given to the inmate and the entire matter dropped and all documentation destroyed.

9.    The permanent ban of an issue of a publication may not be relied upon to support an exclusion of a subsequent issue. For example, if the January issue of XYZ magazine is permanently banned, this ban may not be used

AR 448 – December 19, 2005

to justify an exclusion of the February issue of XYZ magazine. Each separate issue must be evaluated independently in accordance with this regulation.

10. Inmates will not be allowed to be members of, enter into contractual agreements with, or participate in book clubs.

I. Packages

1. All religious materials such as books, pamphlets, brochures, and religious study courses shall be sent to the inmate in care of the Chaplain, and will be distributed by the Chaplain after approval and limits have been obtained from the Warden.

2. Authorized inmates will be allowed to purchase, from their PMOD accounts, arts and craft items through approved reputable suppliers.

3. Prior to Christmas, the Commissioner will publish instructions concerning the receipt of Christmas packages for inmates.

4. Criteria for an inmate to receive Christmas packages are as follows:

    a. Inmates must have a four (4) month clear record prior to November 1st – no disciplinaries or behavior citations.

    b. Inmates who receives one (1) formal or informal disciplinary in the months of November and December will not be eligible to receive a package.

    c. Inmates found guilty of rules violations for indecent exposure/exhibitionism, assaults on staff, or other acts of violence of a serious nature will be restricted from receiving packages one year from the incident.

5. Incentive Packages will be accepted beginning May and September for one package per inmate from a person on the inmate's visitation/funds list. Packages postmarked after May 31 and September 30 will be returned to the sender C.O.D. Inmates must submit a request for an incentive package to the Warden/designee.

6. Criteria for an inmate to receive an incentive package are as follows:

    a. Inmate must have six-month clear record-no disciplinaries or behavior citations.

    b. Inmates found guilty of rules violations for indecent exposure/exhibitionism, assaults on staff, or other acts of violence

AR 448 – December 19, 2005

of a serious nature will be restricted from receiving packages one year from the incident.

    c.    Inmate should have two positive counselors/work reports within the six-month period preceding the package.

7.    An inmate may mail outgoing packages. However, these packages will be inspected for unauthorized items prior to dispatch. The sender-inmate must provide postage and wrapping materials.

8.    The Commissioner/designee may allow other packages as deemed appropriate.

## VI.    DISPOSITION

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII.    FORMS

ADOC Form 448 – Notification of Rejected Mail

## VIII.    SUPERCEDES

This regulation formally included in Administrative Regulation 303, dated May 30, 2000.

## IX.    PERFORMANCE

ACA standards for Adult Correctional Institutions, fourth edition:  4-4487; 4-4490; 4-4491; 4-4492; 4-4494; 4-4496

_Donal Campbell_

Donal Campbell, Commissioner

AR 448 – December 19, 2005

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS

**Notification of Rejected Mail**

From: _____    Date: _____
            Institutional Mail Room

To: Inmate _____ AIS#: _____

    Cell/Dorm: _____ Bed #: _____

Correspondence From: _____

Date received at this Institution: _____

Is being returned to sender due to the following reason(s): _____
_____
_____
_____

The inmate has the option to return mail to sender at his/her own expense within thirty (30) days
or the property will be destroyed.

The inmate has seventy-two (72) hours from the above date to appeal this return. State your
reason(s) for appealing in writing below and return this form to the Warden/designee:

_____
_____
_____
_____
_____
_____
_____

_____ / _____
Inmate Signature                                        AIS#

_____
Date

**Appeal/Denied**                                        **Appeal/Upheld**

_____        _____
Printed Name                                             Printed Name

_____        _____
Authorized Signature                                    Authorized Signature

_____        _____
Date returned to sender                                 Date returned to inmate

**ADOC Form 448 – December 19, 2005**

AR 448 – December 19, 2005

**Womble, Joseph (DOC)**

| | |
|---|---|
| **From:** | Bohannon, Susan (DOC) |
| **Sent:** | Thursday, October 19, 2006 12:06 PM |
| **To:** | DOC -- #Warden Secretary; DOC -- #Wardens; DOC -- #WR Wardens; DOC -- #WR Wardens Secretary |
| **Subject:** | Christmas Package Criteria |

**Only the inmates meeting the Christmas package criteria established in Admin. Reg. 448 will be eligible to receive a Christmas package.**

Susan Bohannon
Administrative Support Assistant III
Nursing Services
Alabama Department of
(334) xxx-xxxx
(334) xxx-xxxx fax
susan.bohannon@doc.alabama.gov



## Womble, Joseph (DOC)

**From:**    Womble, Joseph (DOC)
**Sent:**    Wednesday, December 13, 2006 2:59 PM
**To:**      'Misty Fraser'
**Subject:** FW: Read: Mistake about the verfication list.

Misty,
Inmates Wright, Guthrie, Bolden, Marshall and Powell do not meet the criteria to receive their package.    What do I need to do with these packages?
Inmate Ladd transferred to another facility, I will forward this package to them.
Thanks, Joseph Womble

**From:** Womble, Joseph (DOC)
**Sent:** Friday, December 08, 2006 2:13 PM
**To:** 'Misty Fraser'
**Subject:** RE: Read: Mistake about the verfication list.

I have received and verified my list. I have 6 changes.

| Order # | Inmate Name | AIS # | Facility Code | |
|---------|-------------|-------|---------------|---|
| 672 | Willie Lewis Wright | 209612 | 10 | Can Not Receive |
| 1435 | Brian Guthrie | 157451 | 8 | Can Not Receive |
| 1472 | Kevin Bolden | 243343 | 10 | Can Not Receive |
| 1763 | Brain Ladd | 220267 | 69 | |
| 6203 | Carl Marshal | 110574 | 10 | Can Not Receive |
| 6638 | Leroy Powell | 227738 | 10 | Can Not Receive |

Is this all I need to do, please advise.
Notes:
Inmate Ladd was transferred from Red Eagle to Elmore.
Inmate Guthrie was transferred to Kilby pending disciplinary action.

Joseph Womble
Red Eagle Honor Farm


**From:** Misty Fraser [mailto:mfraser@acs-us.com]
**Sent:** Friday, December 08, 2006 10:39 AM
**To:** Womble, Joseph (DOC)
**Subject:** Read: Mistake about the verfication list.


Your message

   To:  Misty Fraser
   Subject:  RE: Mistake about the verfication list.
   Sent:  12/8/2006 10:26 AM

was read on 12/8/2006 10:38 AM.


12/14/2006


DEFENDANT'S
EXHIBIT

# ALABAMA DEPARTMENT OF PUBLIC HEALTH
## FOOD ESTABLISHMENT / RETAIL FOOD STORE INSPECTION REPORT

SCORE **96**

**Montgomery** COUNTY HEALTH DEPARTMENT

LEGAL NOTICE TO THE PROPRIETOR OR MANAGER: You are respectfully notified of such violations of the Alabama State Board of Health Rules for Food Establishment Sanitation as are indicated by a circle in the Inspection Report. This report constitutes an official notice to comply with Chapter 420-3-22 of the aforesaid Rules within a period of _____ days. Failure to comply with this notice may result in cessation of food service food store operations.

| ESTABLISHMENT NAME | OWNER OR MANAGER NAME |
|---|---|
| Red Eagle Honor Farm | State of Alabama |

| ADDRESS | | ZIP CODE |
|---|---|---|
| 1290 Red Eagle Road | Montgomery, AL 36110- | Date Prev Insp 03/31/05 |

| PERMIT NUMBER | MO. | DAY | YEAR | INSP. TIME | PERMITTED | PRIORITY CAT. | COMPLIANCE VISIT/ INSP. REQUIRED |
|---|---|---|---|---|---|---|---|
| | 04 | 10 | 06 | IN / OUT | YES ☑ NO | 01 | YES ___ NO ___ |

43   Jail/Prison Food Service

**CRITICAL ITEMS REQUIRING IMMEDIATE ACTION**

## MANAGEMENT AND PERSONNEL

| | | |
|---|---|---|
| 01* | Assignment of Person in Charge; Commissary used. Personnel with infections restricted, excluded. No discharges from eyes, nose, mouth. | |
| 02* | Hands clean; properly washed. No bare hand contact; approved alternative. No eating, drinking, tobacco use. | 5 |
| 03* | Demonstration of knowledge: Approved course, other requirements met | +2 |
| 04 | Clean clothes; Hair restraints; Nails. Authorized personnel. Other. | |

## FOOD

| | | |
|---|---|---|
| 05* | Safe; Source; Condition; Not adulterated; Shellstock tags; Compliance with plan/ROP. Other. | |
| 06* | Potentially hazardous food meets temperature requirements during receiving, cooking, hot holding, cooling. Pasteurized eggs used if required. | 5 |
| 07* | Potentially hazardous food meets temperature requirements during cold holding. Time as a public health control. Consumer Advisory used if required. | 5 |
| 08* | Food separated, protected from contamination. Tasting. Returned, reservice of food. | 5 |
| 09 | Cooling methods. Facilities to maintain product temperature. Plant food cooking. | |
| 10 | Properly labeled; Original container. Records. Code date limits. | 1 |
| 11 | Thermometers provided, accurate, conspicuous. | 1 |
| 12 | Approved thawing methods used. | 1 |
| 13 | Food contamination prevented during storage, preparation, display, handling, other. *use prep for flaw, req.* | 1 |
| 14 | In use, between use, food/ice dispensing utensils properly stored. | |

## EQUIPMENT, UTENSILS, AND LINENS

| | | |
|---|---|---|
| 15* | Equipment; food contact surfaces (non-cooking) clean; sanitized. Sanitization temperature, concentration, time. | 5 |
| 16* | Food contact surfaces characteristics. Single service/use used when required. | 4 |
| 17 | Cooking surfaces, non-food contact surfaces: clean. Frequency; Methods. | 1 |
| 18 | Food (ice), Non-food contact surfaces: constructed, cleanable, installed, located. | 1 |
| 19 | Warewashing facilities: designed, constructed, maintained, installed, located, operated. Accurate thermometers. Chemical test papers. | 1 |
| 20 | Linens properly stored, dried, handled. Laundry facilities used. | 1 |
| 21 | Wiping cloths; clean, use limitations. | 1 |
| 22 | Storage, handling, drying of clean equipment, utensils. *wet not clean* | 1 |
| 23 | Single service articles, storage, dispensing, wrapped, Use limitations. Gloves used properly. | |

## WATER, PLUMBING, AND WASTE

| | | |
|---|---|---|
| 24* | Water: Source; Quality, Capacity, System; Approval. | 4 |
| 25* | Sewage, grease disposal: System approved; Flushed (mobile) | 4 |
| 26* | Cross connection: Back siphonage; Backflow. | 4 |
| 27* | Handwashing facilities: Toilets; Number; location. | 4 |
| 28 | Water supply, Waste disposal: Approved system (fixtures), materials, design, operation; maintenance. Other liquid wastes properly disposed. Service sink provided. | 1 |
| 29 | Handwashing facilities: Soap, towels/drying device, other, use restrictions. | 2 |
| 30 | Toilet rooms constructed, supplied. | 1 |
| 31 | Refuse, recyclables, and returnables. Outdoor/indoor storage area approved. Receptacles provided; covered. Approved refuse disposal method. | 1 |

## PHYSICAL FACILITIES

| | | |
|---|---|---|
| 32* | Food contamination and cleaning equipment prevented. | |
| 33* | Presence of insects, rodents, other pests. Animals prohibited. | 1 |
| 34 | Pests controlled methods approved, used. Pest control devices serviced as required. | 1 |
| 35 | Premises, Free of litter, harborage. | 1 |
| 36 | Floors, walls, ceilings, attached equipment: clean. Floor openings protected. *dishwash area* Surface characteristics, indoor, outdoor: Maintained. Cleaning frequency, dustless methods. Absorbent floor materials properly used. | 6 |
| 37 | Lighting, Ventilation: adequate. Ventilation systems (filters), clean, operated. Lights shielded. | |
| 38 | Dressing rooms provided. Storage designated areas properly located. Living/sleeping quarters separation. | |
| 39 | Cleaning, maintenance tools properly stored. | |

## POISONOUS OR TOXIC MATERIALS

| | | |
|---|---|---|
| 40* | Toxic, poisonous items; Medicines; First aid materials and others. Labeled; Used. | 1 |
| 41 | Other personal care/first aid items: Stored; Labeled. Toxic or poisonous materials separation; Non-toxic tracking powder. | |

## OTHER

| | | |
|---|---|---|
| 42 | Permit, Report, Other properly posted. Administrative requirements, HACCP plan | 1 |

| | | |
|---|---|---|
| RECEIVED BY: Name Jimmy Rains | | INSPECTED BY: Name Cindy Goocher |
| Title Steward II | | Cindy Goocher |

REMARKS

ADPH-FLP-103 (Rev. 11-04-kw)

DEFENDANT'S EXHIBIT 12

# ALABAMA DEPARTMENT OF PUBLIC HEALTH
## DETENTION FACILITY INSPECTION REPORT

Donald E. Williamson, MD
State Health Officer

**Montgomery** County

| NOTICE: | The deficiencies noted should be addressed as soon as possible. The recommendations to correct the noted deficiencies are based upon Alabama Department of Public Health "Guidelines for the Inspection of Prisons and |
|---|---|

| **Facility Name:** | **Red Eagle Honor Farm** |
|---|---|
| **Director:** | **State Of Alabama** |
| **Address:** | **1290 Red Eagle Road, Montgomery, AL 36110-** |

| Date | Insp. Time | Design Capacity | Population | Telephone Number | Purpose |
|---|---|---|---|---|---|
| 0 4 1 0 0 6 | Out / In | 308 | 267 | 242-2510 | ☒ Regular  ☐ Other  ☐ Compliance |

| Description | Non-Compliance? (X) | Comments |
|---|---|---|
| **01 Water:** source, approved; Public (✓) Private ( ) Hot and cold water under pressure; Drinking water provided | | |
| **02 Sewage:** Sewage and waste water disposal Public ( ) Private (✓) | | |
| **03 Plumbing:** Installed, maintained; Cross connections, back siphonage, backflow | | |
| **04 Toilet, Hand Washing, Bathing Facilities:** Adequate number, convenient, designed, installed Good repair, clean; Hand cleaner, tissue, towels provided | | |
| **05 Solid Waste:** Containers, adequate number, clean covered; Outside storage area clean, properly constructed | | |
| **06 Vermin Control:** Presence of insects, rodents Outer openings protected | | |
| **07 Floors, Walls, Ceilings:** Floors, constructed, drained, clean, good repair; Walls and Ceilings good repair, clean | X | *Paint peeling - A* |
| **08 Lighting:** Adequate, provided as required | | |
| **09 Heating/Ventilation:** Room temperature maintained Room and equipment vented as required | | |
| **10 Laundry:** Clean, soiled clothing, linen properly stored Clean and good repair; Equipment, good repair, maintained carts | X | *laundry carts* |
| **11 Clothing:** Provided, regular changes, clean | | |
| **12 Bedding:** Clean linen provided Mattresses, etc., in good repair, storage *pillow, mattresses* | X | *A & B* |

Areas Visited: _____
_____
_____
_____
_____
_____
_____

Inspected By:    **Cindy Goocher**

Signature: *Cindy Goocher*

Accompanied By *Warden Hadley*

Signature: _____

Received By: *Warden Hadley*

Title: _____

Signature: _____

DEFENDANT'S EXHIBIT 13

ADPH-FLP-1103 / 3-2004 (BS)



# STATE OF ALABAMA
## DEPARTMENT OF INSURANCE
### State Fire Marshals Office
201 Monroe Street, Suite 1778
Post Office Box 303352
Montgomery, Alabama 36130-3352
Telephone: (334) 241-4166
Facsimile: (334) 241-4158
Email firemarshal@insurance.state.al.us
Website www.aldoi.org

Walter A. Bell
Commissioner

State Fire Marshal
Edward S. Paulk

**BOB RILEY**
GOVERNOR

### INSPECTION REPORT

**DATE OF REPORT**            : February 23, 2007

**DATE OF INSPECTION**        : February 23, 2007

**NAME OF FACILITY**          : Red Eagle Honor Farm

**STREET ADDRESS**            : 1290 Red Eagle Road
                                Montgomery, AL 36110

**OWNER**                     : Alabama Department of Corrections

**COMMISSIONER**              : Richard Allen
                                301 S. Ripley Street
                                P.O. Box 301501
                                Montgomery, AL. 36130-1501

**COUNTY**                    : Montgomery **(3)**

Deputy State Fire Marshal Jeffrey H. Thompson conducted an inspection of Red Eagle Honor Farm on **February 23, 2007**. The inspection of this facility was conducted at the direction of State Fire Marshal Ed Paulk due to receiving a complaint filed in writing by an inmate stating that fire code violations exist through out.

Corrections Maintenance Supervisor assisted this deputy during the inspection. The use condition for this facility is Use Condition I Free Egress and was opened in 1972. At the time of this inspection the inmate population consisted of **335** male inmates. According to capacity of correctional facilities Maintenance Man **340** is maximum capacity.

The facility fire extinguishers were last serviced in May 2006 by Brendle Fire Equipment. Monthly visual inspections are being conducted with documentation on a tag stating month and initial of inspector. The kitchen hood extinguishing system **(Wet Chemical new 1990)** last inspection was conducted by Fire Tech in December 2006. A hydrostatic test was conducted two weeks after noted inspection. There is not a **K** fire extinguisher located in the kitchen.

1



DEFENDANT'S
EXHIBIT
14

The Chapel has an occupant seating capacity of **121**. The existing water tower is no longer in service and the campus has fire hydrants with just under the required water main size of 6 inches with 4 inch mains.

During the inspection of the **Detention Facility** the following deficiencies were noted:

1. **Dorm C** has an improper landing at one of its exits.
**Note**: NFPA 101 2003 Edition section 7.2.1.3.6 In existing buildings, a door at the top of a stair shall be permitted to open directly at a stair, provided that the door does not swing over the stair and that the door serves an area with an occupant load of fewer than 50 persons.
**\*\*\* Landing was built 3/5/2007**

2. Records of employee training shall be kept on fire extinguisher and other manual fire suppression equipment.
**Note: NFPA 101 2003 Edition Chapter 23 section 23.7.1.4 - 23.7.4.2** states: Employees of detention and correctional occupancies shall be instructed in the proper use of portable fire extinguishers and other manual fire suppression equipment. Such training shall be provided to new staff promptly upon commencement of duty. Refresher training shall be provided to existing staff at not less than annual intervals.
**\*\*\* Policy is being written to train employees**
3. Emergency lighting required in Chapel area and exit access corridor.
**\*\*\* Repaired 2/27/2007**
4. Fuel dispensing area had a leak causing product to escape into the containment area with some product being drained outside containment to the ground.
**Note**: According to the maintenance supervisor of the mechanic shop they had to replace a coupling where the tank connects to the dispensing unit
**\*\*\* Repaired 2/23/2007**
5. Emergency light damaged at entrance to dorm B.
**\*\*\* Repaired 2/26/2007**
6. Smoke detector missing in Dorm B.
**Note**: Check manufactures recommendation on proper coverage of smoke detector.
**\*\*\* Repaired 3/1/2007**
7. Emergency light in dorm A did not function on test mode. Possible dead battery. Also the emergency light that is tied into the emergency generator is broken.
**\*\*\* Repaired 2/27/2007**
8. Receptacle outlet in the visitation building that provides power for the drink machine needs to be reset in the wall.
**\*\*\* Repaired 2/23/2007**
9. There were no deficiencies noted this date in the maintenance and wood working shops.

10. There are new HVAC units in Dorm A & B.

**11.** The kitchen area has seating capable to sit 74 but there is only one exit out of this area and the door swings against travel.

**Note**: A safe number to be placed in this area at one time would be 49 people only. You can not use the exit through the kitchen as a secondary exit because it is classified as a hazardous area.

**\*\*\* Estimates are being prepared to install another exit door.**

**12.** A **K** fire extinguisher is required to be in place to be compatible with the wet extinguishing system installed to protect the cooking appliances.

**\*\*\* Installed K fire Extinguisher 3/2/2007**

**13.** The proper way to clean the duct system in the kitchen is to have it steamed from the fan down.

**Note**: Only filters and locations that can be easily wiped down have been cleaned.

**\*\*\* Chief Steward is preparing cleaning schedule with Maintenance Supervisor.**

**14.** Emergency light appliances noted throughout correction facility not tested per code.

**Note**: **NFPA 101 2003 Edition Chapter 7 section 7.9.3** states: Periodic Testing of Emergency Lighting Equipment. Section 7.9.3.1 required emergency lighting systems shall be tested in accordance with one of the three options offered by 7.9.3.1.1, 7.9.3.1.2, or 7.9.3.1.3. 7.9.3.1.1 Testing of required emergency lighting systems shall be permitted to be conducted as follows:

**(1)** Functional testing shall be conducted at 30-day intervals for not less than 30 seconds.

**(2)** Functional testing shall be conducted annually for not less than 1½ hours if the emergency lighting system is battery powered.

**(3)** The emergency lighting equipment shall be fully operational for the duration of the tests required by 7.9.3.1.1(1) and 7.9.3.1.1(2).

**(4)** Written records of visual inspections and tests shall be kept by the owner for inspection by the authority having jurisdiction.

**\*\*\* Maintenance Supervisor will prepare policy for testing and documenting these tests.**

**15.** Occupant use fire hose in cabinets to be serviced **5** years after the manufacture date of the hose and then every three years thereafter.

**\*\*\* Maintenance Supervisor will prepare policy and document service.**

**16.** Employees of detention and correctional occupancies shall be instructed in the proper use of portable fire extinguishers and other manual fire suppression equipment. With respect to new staff, such training shall be provided promptly upon commencement of duty. With respect to existing staff, refresher training shall be provided at a minimum annually. Records shall be kept of such training.

**\*\*\* Policy is being written to train employees**

**17.** Facility emergency generator providing power to emergency lighting systems and other equipment shall be installed, tested, and maintained in accordance with **NFPA 110**, Standard for Emergency and Standby Power Systems.

**Note:** Only records on premise support weekly running of generator consisting of crank up and almost immediate shut down times.

**\*\*\* Maintenance Supervisor will review NFPA 110 and comply.**

**18.** All places noted on the inmate's complaint were inspected and if not listed above in remarks/comments then this deputy noted no code violations at this time.

3

**19.** The Facility Emergency Evacuation Plan was reviewed and found to be sufficient this date as prepared by Warden Hadley 9-18-06.

**20.** It was not proven that there was a faulty $H2O$ heater was installed. There was a change over from propane gas to natural system. The system has been evaluated and there does not appear to be any more problem with this area.

**21.** The laundry area needs to be careful not to place combustibles with in 3 feet of the $H2O$ heater.

**Remedial action must be carried out immediately to correct all violations noted. The State Fire Marshal's Office does not grant permission or approval for the operation of any facility where code violations exist. A representative of this office will conduct a follow-up inspection within 15 to 30 days to examine remedial action efforts.**

If you have any questions please do not hesitate to call 334-241-4166.

J.H. Thompson
Deputy State Fire Marshal
jeffrey.thompson@insurance.alabama.gov

4

UPS Ground    S.D.P.

**UPS**

**Shipping Document**

See instructions on back.
Visit UPS.com® or call 1-800-PICK-UPS® (800-742-5877) for additional information.

**1 SHIPMENT FROM**

SHIPPER'S UPS ACCOUNT NO.

TRACKING NUMBER    UPS ACCOUNT NO.    K019 407 973 1

REFERENCE NUMBER    0 9 2 6 1 E

COMPANY

NAME    RED EAGLE Auto's Return

STREET ADDRESS    1290 RED EAGLE RD

CITY AND STATE    Montgomery AL 36110    ZIP CODE

TELEPHONE

**2 DELIVER TO**

COMPANY    American Cummis Beauty Supply

NAME

STREET ADDRESS    790 Tyler RD

CITY AND STATE    Russellville AR    ZIP CODE 72802

Residential Delivery

**3 WEIGHT**    WEIGHT WHOLE LBS. ONLY    52    OVERSIZE    OS 1 / OS 2 / OS 3/IP

**4 GROUND S.D.P. SHIPPING CHARGES**    $

**5 OPTIONAL SERVICES**    INSURED VALUE    $    AMOUNT

C.O.D. shipping may be available at UPS.com

**6 ADDITIONAL HANDLING CHARGE**    An Additional Handling Charge applies for certain items. See restrictions.    $

**7 TOTAL CHARGES**    $

**8 METHOD OF PAYMENT**    BILL SHIPPER    BILL RECEIVER    BILL THIRD PARTY    CREDIT CARD
American Express    Discover    MasterCard    Visa

RECEIVER'S/THIRD PARTY'S UPS ACCT. NO. OR MAJOR CREDIT CARD NO.    EXPIRATION DATE

THIRD PARTY'S COMPANY NAME

STREET ADDRESS

CITY AND STATE    ZIP CODE

**9 SHIPPER'S SIGNATURE**    X    DATE OF SHIPMENT 12-11-06

This form not needed with UPS Internet Shipping at UPS.com

021295 1-04 TW

SHIPPER'S COPY    G    G +    I

DEFENDANT'S
EXHIBIT
15

STATE OF ALABAMA                              INMACP
DEPARTMENT OF CORRECTIONS
ALEXANDER CITY CBF

TRANSACTION INFORMATION BY AIS# FROM JAN. 01, 2007 THRU JUL. 03, 2007

AIS#: 110574          NAME: MARSHALL, CARL VINCE          BED NBR: B01022A          PMOD BALANCE:     $221.98

| DATE OF TRANSACTION | PREVIOUS BALANCE | NAME OF PAYEE OR SENDER | TRANS. NUMBER | TYPE OF TRANSACTION | TRANSACTION AMOUNT | C. O. P. DEDUCTED | CURRENT BALANCE |
|---|---|---|---|---|---|---|---|
| 04/05/2007 | $   .00 | INST. TRANSFER | 2007003748 | MISC RECEIPTS | $  9.25 | $   .00 | $   9.25 |
| 04/09/2007 | $  9.25 | THE INMATE | 2007007831 | MISC WITHDRAWAL | $  6.00 | N/A | $   3.25 |
| 04/20/2007 | $  3.25 | AMERICAN COMM. SUPPLY | 2007004071 | MISC RECEIPTS | $ 55.10 | $   .00 | $  58.35 |
| 05/01/2007 | $ 58.35 | 041807 HORSESHOE | 2007004164 | W/R PAYROLLS | $ 60.30 | $   .00 | $ 118.65 |
| 05/03/2007 | $ 118.65 | | 2007009150 | TRANSPORTATION | $  7.50 | N/A | $ 111.15 |
| 05/07/2007 | $ 111.15 | INST. TRANSFER | 2007004459 | MISC RECEIPTS | $ 32.40 | $   .00 | $ 143.55 |
| 05/08/2007 | $ 143.55 | THE INMATE | 2007009355 | MISC WITHDRAWAL | $ 40.00 | N/A | $ 103.55 |
| 05/08/2007 | $ 103.55 | PAT EDMONDSON | 2007009612 | MISC WITHDRAWAL | $ 12.50 | N/A | $  91.05 |
| 05/21/2007 | $ 91.05 | TALLAPOOSA HEALTH DEPT | 2007009939 | MISC WITHDRAWAL | $ 12.00 | N/A | $  79.05 |
| 05/21/2007 | $ 79.05 | THE INMATE | 2007010056 | MISC WITHDRAWAL | $ 45.00 | N/A | $  34.05 |
| 06/06/2007 | $ 34.05 | 060107 KOCH FDS | 2007005111 | W/R PAYROLLS | $ 80.11 | $ 26.71 | $ 114.16 |
| 06/13/2007 | $ 114.16 | THE INMATE | 2007010646 | MISC WITHDRAWAL | $ 40.00 | N/A | $  74.16 |
| 06/13/2007 | $ 26.71 | CASE #2005-001513 | 2007010833 | C.O.P. DISB.-01 | $ 26.71 | N/A | $   .00 X |
| 06/14/2007 | $ 74.16 | 060807 KOCH FDS | 2007005280 | W/R PAYROLLS | $ 116.60 | $ 38.87 | $ 190.76 |
| 06/18/2007 | $ 190.76 | 061507 KOCH FDS | 2007005404 | W/R PAYROLLS | $ 91.01 | $ 30.34 | $ 281.77 |
| 06/19/2007 | $ 281.77 | PAT EDMONDSON | 2007011286 | MISC WITHDRAWAL | $ 12.50 | N/A | $ 269.27 |
| 06/25/2007 | $ 269.27 | 062207 KOCH FDS | 2007005561 | W/R PAYROLLS | $ 93.46 | $ 31.16 | $ 362.73 |
| 06/25/2007 | $ 362.73 | MONEY TAKEN OFF INMATE | 2007005623 | MISC RECEIPTS | $ 19.25 | $   .00 | $ 381.98 |
| 06/28/2007 | $ 381.98 | | 2007011709 | TRANSPORTATION | $ 20.00 | N/A | $ 361.98 |
| 06/29/2007 | $ 361.98 | CARL MARSHALL | 2007011793 | MISC WITHDRAWAL | $ 140.00 | N/A | $ 221.98 |

PAGE:     1          X = C.O.P. ESCROW     * = ERROR IN BALANCES



DEFENDANT'S
EXHIBIT
16

STATE OF ALABAMA                          INMACP
DEPARTMENT OF CORRECTIONS
ALEXANDER CITY CBF

TRANSACTION INFORMATION BY AIS# FROM JAN. 01, 2007 THRU JUL. 03, 2007

AIS#: 110574          NAME: MARSHALL, CARL VINCE       BED NBR: B01022A          PMOD BALANCE:     $221.98

| DATE OF TRANSACTION | PREVIOUS BALANCE | NAME OF PAYEE OR SENDER | TRANS. NUMBER | TYPE OF TRANSACTION | TRANSACTION AMOUNT | C. O. P. DEDUCTED | CURRENT BALANCE |
|---|---|---|---|---|---|---|---|
| 07/02/2007 | $ 100.37 | CASE #2005-001513 | 2007011895 | C.O.P. DISB.-01 | $ 100.37 | N/A | $ .00 X |
| | | | | TOTALS: | $ 1,020.06 | $ 127.08 | |

LAST PAGE:    2          X = C.O.P. ESCROW    * = ERROR IN BALANCES